604 S.E.2d 385

**Bert C. ATKINSON and Stephanie S. Atkinson,
Respondents–Appellants,**

v.

**ORKIN EXTERMINATING CO., INC., Appellant–Respondent.**

No. 25883.

Supreme Court of South Carolina.

Heard Nov. 5, 2003.

Decided Oct. 25, 2004.

G. Dana Sinkler, of Warren and Sinkler, of Charleston; Michael W. Davis and Robert N. Hochman, both of Sidley, Austin, Brown, & Wood, of Chicago, for Appellant–Respondent.

Keating L. Simons, III, of Simons and Keaveny, of Charleston, for Respondents–Appellants.

Chief Justice TOAL.

This cross-appeal arises from an action brought by homeowners Bert and Stephanie Atkinson (Atkinsons) against Orkin Exterminating Company (Orkin), seeking recovery for

structural damage to their home caused by termite infestation. In this appeal, Orkin seeks a remittitur of the punitive damages award, and the Atkinsons seek reversal of the trial court's decision to offset their compensatory damages by the amount they received in a settlement from a third party.[1] After certifying this case from the court of appeals pursuant to Rule 204(b), SCACR, we reverse and remand the issue concerning the amount of punitive damages, with instructions, and reverse the trial court's decision to offset compensatory damages.

### FACTUAL/PROCEDURAL BACKGROUND

In the underlying action, the Atkinsons sued Orkin, among others, for breach of contract with a fraudulent act and negligence.

### A. BREACH OF CONTRACT WITH A FRAUDULENT ACT

When the Atkinsons purchased their home in 1995, they discovered that the previous owners of the house had purchased and maintained a termite bond from Orkin since 1972. The documents comprising the termite bond included a LIFE-TIME TERMITE DAMAGE GUARANTEE, which provided up to $100,000 in recoverable repair costs for termite damage at a fixed, renewable rate of $28 per year (fixed-rate provision). The guarantee also included a provision that allowed customers to transfer the bond to any subsequent purchaser of the house (transferability provision). Orkin categorizes this version of the LIFETIME TERMITE DAMAGE GUARAN-TEE as a "pre–1975 contract" because it provided benefits and coverage not available to customers today.[2]

Soon after the Atkinsons moved into their new home, they attempted to have the termite bond transferred to them as permitted by the transferability provision. But, when the Atkinsons contacted Earl Beck (Beck), then manager of Or-

---

**1.** Initially, the Atkinsons sued both Terminix Service, Inc. (Terminix) and Orkin but settled with Terminix for $31,111.75 before trial.

**2.** In 1975, Orkin changed its contracts omitting the fixed-rate provision and including language allowing Orkin to unilaterally increase renewal rates.

kin's Charleston office, seeking to have the bond transferred in their name, Beck refused. Instead, Beck offered the Atkinsons a new contract with less desirable terms. The Atkinsons rejected the offer, and Orkin canceled the termite bond in June 1996 for non-payment. At trial, Orkin admitted that it breached the contract when it refused to honor the transferability provision.[3]

Because Orkin refused to transfer the contract, the Atkinsons obtained coverage from Terminix. In August 1996, after Orkin's protection had expired and while Terminix's bond was in force, the Atkinsons discovered termites and termite damage in the structure of their house. Terminix denied full coverage, asserting that most of the termite damage took place during the twenty-four years that Orkin's coverage applied.

## B. Negligence

Before the Atkinsons purchased the house, Orkin conducted a routine inspection and reported that the residence was free of termites and termite damage. Shortly after they moved into the house, the Atkinsons found living termites and termite damage in a windowsill. Further investigation revealed termite damage in the structure of the house.

To determine the extent of the termite damage, the Atkinsons hired Cam Lay of Clemson University's Department of Pesticide Regulation (South Carolina's regulatory agency for pest control businesses) to conduct an additional inspection of the house. Lay concluded that Orkin (1) failed to report termite damage, (2) violated state regulatory standards by failing to disclose powder-post-beetle damage and decay damage, and (3) failed to disclose crawl-space-moisture readings. At trial, Orkin admitted that it negligently failed to disclose prior termite damage to the house in its inspection report but denied the remaining allegations in Lay's report.

---

3. The trial court found that Beck, as manager of Orkin's Charleston branch, was Orkin's agent, and therefore Orkin was vicariously liable for Beck's actions.

## C. ORKIN'S 1980 INITIATIVE

In 1980, Orkin's president wrote a memorandum outlining an initiative that directed branch managers to raise the renewal rates of all pre–1975 contracts in direct contradiction to the fixed-rate provision. The memo prescribed the manner in which managers were to deal with customers complaining about rate increases. It provided that if the customers mentioned a pamphlet that Orkin sent to some customers to promote the fixed-rate provision, the managers would ask the customers to read the fixed-rate language aloud, over the telephone. If the customers repeated the language verbatim, the manager would tell them that "a computer mistake was made" and that a corrected bill would be sent. But if the customers did not repeat the language verbatim, the customers were told that the rates were "eligible for increase" according to a "recent legal ruling." At trial, over Orkin's objection, the judge allowed the Atkinsons to submit this memo into evidence.

Four years after Orkin began its initiative to raise rates, the Federal Trade Commission ("FTC") filed an administrative complaint alleging that Orkin's unilateral renewal rate increase was an unfair trade practice. In addition, the administrative law judge ordered Orkin to reimburse those customers who paid increased rates pursuant to Orkin's initiative. The Eleventh Circuit Court of Appeals affirmed the ALJ's ruling. *Orkin Exterminating Co., Inc. v. Federal Trade Comm'n*, 849 F.2d 1354 (11th Cir.1988).

After Orkin was enjoined from raising rates on its pre–1975 contracts, Orkin decided to change its advertising material as to the transferability provision as well. For many years, the renewal forms Orkin sent to customers contained the statement, "[i]f you sell your property this protection can be transferred to the new owner. An excellent selling point for you." Orkin removed this language from its renewal forms after the FTC ruling.

At trial, Orkin's president admitted that the FTC ruling caused Orkin to lose money and that the company had conducted "some economic analysis" to determine its projected losses. During discovery, Orkin did not disclose any findings

from that analysis.[4] In an attempt to show that Orkin had a financial incentive to breach the transferability provision in its pre–1975 contracts, the Atkinsons retained Dr. Perry Woodside (Woodside), an economist and business professor at the College of Charleston, to project (1) Orkin's current and potential losses for honoring the fixed-rate provision; and (2) Orkin's current and projected gain if Orkin dishonored the transferability provision. The Atkinsons offered Woodside's projections to show that Orkin's gain from breaching the transferability provision would mitigate Orkin's losses due to the FTC ruling. Over Orkin's objection, the trial judge allowed Woodside to testify that Orkin could have sustained "staggering" losses amounting to $53,872,894 as a result of the FTC ruling. In addition, Woodside testified that Orkin could realize a gain of $42,352,548 if it dishonored the transferability provision.

The jury awarded $75,259.33 in compensatory damages— $6,191 for the contract claim and $69,068.33[5] for the negligence claim. The jury also awarded $786,500 in punitive damages for the contract claim.[6]

In a post-trial motion, Orkin requested that the court reduce the Atkinsons' damages award by the amount recovered from the Atkinsons' settlement with Terminix. Because the trial judge found that "Terminix's conduct could be a contributing factor in the negligence cause of action and, thus, a contributing factor to Plaintiff's damages," the judge granted Orkin's motion for set-off. The parties filed notices of cross-appeal and submitted the following issues for review:

I. **Was the punitive damages award so excessive as to violate Orkin's due process rights?**

II. **Did the trial court err in offsetting the Atkinson's judgment by the amount received from the settlement with Terminix?**

---

4. The trial judge found that Orkin abused the discovery process and sanctioned Orkin $25,000.

5. The negligence award breaks down into $10,268.33 for expenses the Atkinsons incurred before trial and $58,800 in repair costs.

6. The trial judge permitted the jury to review Orkin's 1999 financial statement during its consideration of punitive damages. The punitive damages award constituted one percent of Orkin's net worth that year.

LAW/ANALYSIS

## I. DUE PROCESS AND PUNITIVE DAMAGES

The jury returned a verdict finding Orkin liable for breach of contract accompanied by a fraudulent act and awarded $6,191 in compensatory damages and $786,500 in punitive damages, a ratio of approximately 127 to 1. Orkin argues that the punitive damages award was so excessive that it violated its right to due process. We agree.

The practice of awarding punitive damages originated in principles of criminal law "to deter the wrongdoer and others from committing like offenses in the future." *Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 393, 134 S.E.2d 206, 210 (1964). Historically, our courts have recognized that punitive damages are intended to punish a wrongdoer when "criminal" conduct is intertwined with civil causes of action. *See* Dorsey D. Ellis, Jr., *Fairness and Efficiency in the Law of Punitive Damages*, 56 S. Cal. L. Rev. 1, 12–20 (1982) (describing how the court system has come to approve public punishment in private actions by utilizing punitive damages). This Court has held that "[p]unitive damages also serve to vindicate a private right to the injured party." *Clark v. Cantrell*, 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000) (quoting *Harris v. Burnside*, 261 S.C. 190, 196, 199 S.E.2d 65, 68 (1973)).

The policy behind awarding punitive damages must also remain consistent with the principle of penal theory that the "punishment should fit the crime." *Mathias v. Accor Economy Lodging Inc. and Motel 6 Operating L.P.*, 347 F.3d 672, 676 (7th Cir.2003). "In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

Because punitive damages are quasi-criminal in nature, the process of assessing punitive damages is subject to the protections of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The Due Process Clause insures that "a person receive fair notice not only of the conduct that will subject him to punishment, but

also of the severity of the penalty that a State may impose." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In addition, a defendant's right to reasonable notice should not be diminished simply because the defendant is a deep pocket corporation. *Id.* at 585, 116 S.Ct. 1589. For example, in *Gore,* the United States Supreme Court proclaimed, "[t]he fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of business." *Id.*

After the parties submitted their briefs in the present case, the United States Supreme Court issued its opinion in *State Farm v. Campbell,* which considered whether a punitive damages award was so excessive as to violate due process. 538 U.S. at 416–429, 123 S.Ct. 1513. In *Campbell,* plaintiffs sued State Farm in a Utah trial court for bad-faith failure to settle—a legal theory similar to South Carolina's bad faith (now negligent) failure to settle cause of action set forth in *Tyger River Pine Co. v. Maryland Cas. Co.,* 170 S.C. 286, 170 S.E. 346 (1933). During trial, the judge allowed the plaintiffs to present evidence of other instances around the nation in which State Farm had refused, in bad faith, to settle a client's claim.

The Utah Supreme Court noted that State Farm was being punished for its nationwide policies rather than for the conduct in the Campbells' case and reduced plaintiffs' punitive damages award from $145 million to $25 million. State Farm subsequently petitioned the United States Supreme Court for a writ of certiorari, which the Court granted. The Court held that the punitive damages award was so excessive as to violate State Farm's due process rights under the Fourteenth Amendment of the United States Constitution. *Campbell,* 538 U.S. at 429, 123 S.Ct. 1513.

In determining the constitutionality of the punitive damages award, the *Campbell* Court looked to three guideposts [7] set forth in *Gore:*

7. The *Campbell* Court used the word "guidepost" to emphasize its intent to create a guide, not a bright-line rule. *Campbell,* 538 U.S. at 424, 123 S.Ct. 1513. For example, Judge Posner of the Seventh Circuit recently explained that it is not necessary for courts to follow rigid

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Campbell,* 538 U.S. at 418, 123 S.Ct. 1513 (citing *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). In addition, the United States Supreme Court applied a *de novo* standard of review and instructed appellate courts to so the same when reviewing punitive damage awards. *Campbell,* 538 U.S. at 417, 123 S.Ct. 1513 (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 435–436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)).

 In the present case, we reverse and remand the issue of punitive damages because (1) the trial court improperly admitted evidence that unfairly prejudices Orkin's case; and (2) the award is so excessive that it constitutes an irrational and arbitrary deprivation of property under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

### 1. DEGREE OF REPREHENSIBILITY OF ORKIN'S MISCONDUCT

Orkin argues that the trial judge caused the degree of reprehensibility of Orkin's conduct to be unfairly inflated by allowing the jury to consider evidence of Orkin's 1980 initiative and Woodside's expert testimony concerning Orkin's current and potential loss for honoring the fixed-rate provision in all its pre–1975 contracts. We agree.

The first guidepost established in *Gore* is the degree of reprehensibility of the defendant's misconduct, which the United States Supreme Court held is "[t]he most important indicium of the reasonableness of a punitive damages award...." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. The United

---

mathematical rules when reviewing a punitive damages award: "What follows from these principles, however, is that punitive damages should be admeasured by standards or rules rather than in a completely ad hoc manner, and this does not tell us what the maximum ratio of punitive to compensatory damages should be in a particular case." *Mathias,* 347 F.3d at 676.

States Supreme Court has provided state courts with a list of considerations to be used in determining the degree of reprehensibility of a defendant's conduct:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
>
> . . .
>
> The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Campbell,* 538 U.S. at 419, 123 S.Ct. 1513.

We find the evidence of Orkin's 1980 initiative and Woodside's expert testimony about the initiative unfairly amplified the degree of reprehensibility of Orkin's conduct and, in turn, unfairly inflated the amount of punitive damages the jury awarded.

### (a) Orkin Initiative Memo

■ The Atkinsons argue that Orkin, which was already enjoined from breaching the fixed-rate provision, was searching for new ways to mitigate the losses of its unprofitable pre–1975 contracts. On the contrary, Orkin contends that because the initiative was not related to the conduct in the Atkinsons' breach of contract claim, the trial judge erred in allowing the memo to be admitted. We agree with Orkin.

The United States Supreme Court considered a similar issue in *Campbell.* During the damages phase, the trial judge allowed the plaintiff to present evidence concerning State Farm's prior conduct, suggesting that State Farm had developed a nationwide policy of denying claims and refusing to settle claims in bad-faith. The trial court not only allowed testimony of State Farm's conduct toward the Campbells, it accepted testimony concerning State Farm's denial of claims around the country. Much of the evidence concerning State Farm's out-of-state conduct was dissimilar and unrelated to

State Farm's conduct toward the Campbells. Because of the dissimilarity in conduct, the United States Supreme Court held that State Farm's out-of-state conduct was not admissible to inflate the Campbells' punitive damages award:

> [t]he courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbell's harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of reprehensibility analysis
>
> . . . .
>
> Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct.

*Campbell,* 538 U.S. at 422–423, 123 S.Ct. 1513.

The "similarity" analysis conducted in *Campbell* arises from the same general relevance safeguards addressed by Rule 403, SCRE (a court shall rule evidence inadmissible if its probative value is substantially outweighed by its prejudicial value). The analysis applied in *Campbell,* however, requires us to determine, in the present case, whether evidence of the 1980 initiative is "similar to" the breach of the transferability provision. In other words, unless Orkin's past conduct is "similar" to the conduct directed at the Atkinsons, it is inadmissible.

For the following reasons, we find Orkin's initiative directing agents to breach the fixed-rate provision (Orkin's past conduct) is dissimilar from Orkin's breach of the transferability provision in the present case. First, Orkin's past "initiative" conduct was directed toward existing customers, while Orkin's "transferability" conduct in the present case only affected the Atkinsons, who were prospective customers. In addition, those affected by Orkin's past conduct would have coverage but for a higher price, while the conduct here forced the Atkinsons to negotiate coverage from an entirely different provider. Finally, Orkin's past conduct involved an attempt to make unprofitable contracts profitable, while the conduct in

the present case was an attempt to get out of an unprofitable contract.

Second, Orkin's past conduct arose from an initiative developed almost fifteen years before Orkin dishonored the transferability provision in the present case. In addition, Orkin was enjoined from unilaterally raising rates more than ten years before Orkin had any contractual obligation with the Atkinsons. We find that the considerable period of time between Orkin's past conduct and Orkin's conduct in the present case lends further support to our finding that the two are dissimilar.

■ Allowing the jury to consider evidence of Orkin's breach of the fixed-rate provision was extremely prejudicial because it allowed the jury to punish Orkin for conduct unrelated to the conduct in the present case. Moreover, at trial, the Atkinsons did not present any evidence that Orkin refused to honor the transferability provision on other contracts in South Carolina. The fact that Orkin stood to gain financially from breaching both provisions of the contract is not sufficient to render the two breaches "similar." Accordingly, we hold that the trial court erred in allowing the Atkinsons to present evidence of the Orkin initiative and, in doing so, permitted the Atkinsons to unfairly exaggerate the degree of reprehensibility of Orkin's conduct.

### (b) Expert Testimony

■ Orkin argues that the trial judge erred in admitting into evidence Woodside's expert testimony concerning Orkin's projected losses for honoring the fixed-rate provision of all its pre–1975 contracts. We agree.

■ It is well settled that "opinion testimony of an expert may be based upon a hypothetical question." *Gazes v. Dillard's Dep't Store, Inc.*, 341 S.C. 507, 514, 534 S.E.2d 306, 310 (Ct.App.2000). But "the hypothetical question must be based on facts supported by the evidence . . . ." *Id.*

We hold that Woodside's testimony as to Orkin's projected loss from honoring the fixed-rate provision of its contracts is inadmissible for the same reasons we find the 1980 initiative was inadmissible. This projection is based upon conduct that

is too dissimilar from the conduct in the present case and is therefore, inadmissible because it unfairly inflates the reprehensibility of Orkin's conduct in the present case.

On the other hand, we are much more hesitant to restrict outright Woodside's testimony concerning Orkin's gain from breaching the transferability provision in all its pre–1975 contracts. This testimony—subject to the evidentiary safeguards of *Gazes* and *Campbell*—could be probative of the reprehensibility of Orkin's conduct in the present case.

### 2. DISPARITY BETWEEN COMPENSATORY AND PUNITIVE DAMAGE AWARDS

■■■ The jury awarded the Atkinsons $786,500 in punitive damages and $6,191 in compensatory damages, representing a 127 to 1 ratio.[8] We hold that such a sizable disparity between punitive and compensatory damages establishes a presumption that the punitive damages award is an unconstitutional deprivation of property.

The *Campbell* opinion provides that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." [9] 538 U.S. at 424, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589). Nevertheless, "the Constitutional line [setting forth the appropriate ratio of actual to punitive damages] is not marked by a simple mathematical formula." *Id.* The

---

8. The jury found for the Atkinsons on both the breach of contract accompanied by a fraudulent act and negligence claims. The punitive damages award attached to the breach of contract accompanied by a fraudulent act claim, which was the only cause of action in the complaint that warrants punitive damages. *See Scott v. Porter*, 340 S.C. 158, 172, 530 S.E.2d 389, 396 (2000) (holding that it is only proper for a jury to award punitive damages for a negligence claim when that negligence was wilful, wanton, or reckless); *Wright v. Public Savings Life Ins. Co.*, 262 S.C. 285, 289, 204 S.E.2d 57, 59 (1974) (holding punitive damages may be awarded when a breach of contract is accompanied by a fraudulent act). Therefore, we did not include the jury's compensatory damages award as to Orkin's simple negligence in our computation of the ratio.

9. The *Campbell* Court recites a long history of statutory sanctions concerning double, treble, or quadruple damages awarded to deter and punish. The Court provides that "while they are not binding, they are instructive" in that they all provide single-digit ratios. *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513.

Court emphasized that "because there are no rigid bench-marks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.*

Recently, the Seventh Circuit Court of Appeals upheld a punitive damages award that exceeded a single-digit ratio where a particularly egregious act resulted in small economic damages. *Mathias,* 347 F.3d at 678. In that case, the plaintiff suffered bites from hundreds of bed bugs when he and his family rented a hotel room from the defendant. The court upheld a punitive damages award that exceeded a single-digit ratio because "[t]he defendant's behavior was outrageous but the compensable harm done was slight and at the same time difficult to quantify because a large element of it was emotional." *Id.* at 677.

Although the amount of compensatory damages in the present case was particularly low, Orkin's acts were not so egregious as to warrant a 127 to 1 ratio. Therefore, we hold that the Atkinsons have failed to rebut the presumption that the three-digit, punitive-compensatory damages ratios in this case is unconstitutional.

### 3. SANCTIONS FOR COMPARABLE MISCONDUCT

Finally, *Campbell* requires us to consider cases involving comparable conduct to determine whether the ratio in the case before us is unconstitutional. After reviewing cases involving breach of contract with a fraudulent act, we find that the 1 to 127 ratio awarded in this case is well above the average compensatory-punitive damages ratio. *See, e.g., Cock–N–Bull Steak House, Inc. v. Generali Ins. Co.,* 321 S.C. 1, 466 S.E.2d 727 (1996) (upholding a punitive damage award that was approximately 28 times compensatory damages); *Pinckney v. Orkin Exterminating Co.,* 268 S.C. 430, 234 S.E.2d 654 (1977) (upholding an award of $5,000 compensatory damages and $4,000 punitive damages).

### II. THE COLLATERAL SOURCE RULE

The Atkinsons argue that proceeds from their settlement with Terminix was a "collateral source," and therefore Orkin was not entitled to any set-off. We agree.

According to the collateral source rule, a wrongdoer should not receive a windfall simply because the injured party received compensation from an independent source. *Rattenni v. Grainger,* 298 S.C. 276, 379 S.E.2d 890 (1989). Moreover, this rule has been liberally applied in South Carolina to preclude the reduction of damages. *See Otis Elevator v. Hardin Constr. Co.,* 316 S.C. 292, 450 S.E.2d 41 (1994) (contractual right to indemnification not defeated by fact that loss was actually paid by an insurance company); *Rattenni,* 298 S.C. at 277, 379 S.E.2d at 890 (1989) (tortfeasor's liability for damages not reduced by underinsurance proceeds); *Powers v. Temple,* 250 S.C. 149, 156 S.E.2d 759 (1967) (tortfeasor's liability for damages not reduced by disability payments from employer). To qualify as a collateral source, the source must be "wholly independent of the wrongdoer." *Citizens and S. Nat'l Bank of South Carolina v. Gregory,* 320 S.C. 90, 92, 463 S.E.2d 317, 318 (1995).

In a post-trial motion, Orkin asked the court to reduce the judgment by the amount the Atkinsons recovered from their settlement with Terminix. Because the judge viewed Terminix and Orkin as joint tortfeasors, the judge reduced the amount Orkin owed by the amount Terminix had already paid in settlement. The trial judge also reasoned that the negligence claim was "general in nature" and that "Terminix's conduct could be a contributing factor in this cause of action and, thus, a contributing factor to Plaintiff's damages under the negligence cause of action."

We find that the trial judge erred in treating Orkin and Terminix as joint-tortfeasors. The duties that Orkin and Terminix owed the Atkinsons were based upon independent, unrelated contracts, not a common duty of care. Moreover, we see no indication that the claims against Terminix constituted a "contributing factor" to Orkin's negligent inspection of the house. Accordingly, we hold that the proceeds from the Terminix settlement was a collateral source, and therefore the trial court erred in offsetting the judgment, by the amount the Atkinsons received in settlement.

## CONCLUSION

We recognize that Orkin's breach of the transferability provision in the contract with the Atkinsons will support a

jury award of significant punitive damages. Nevertheless, after applying the United States Supreme Court's holding in *Campbell,* we reverse and remand this case on the issue of the amount of punitive damages awarded, with instructions that on retrial of the issue of the amount of punitive damages, evidence of Orkin's 1980 initiative and Woodside's expert testimony concerning Orkin's current and potential losses for honoring the fixed-rate provision of its pre–1975 contracts must not be admitted.

We also reverse the trial court's decision to offset the proceeds from the Atkinsons' settlement with Terminix. Accordingly, we affirm the jury's award of $75,259.33 in actual damages without setting off that amount by the $31,111.75 the Atkinsons received in their settlement with Terminix.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.