686 S.E.2d 176

**Jerome MITCHELL, JR., Respondent,**

v.

**FORTIS INSURANCE COMPANY, Appellant.**

**No. 26718.**

Supreme Court of South Carolina.

Heard Jan. 22, 2009.

Decided Sept. 14, 2009.

Rehearing Denied Dec. 17, 2009.

574

C. Mitchell Brown, of Nelson, Mullins, Riley & Scarborough, of Columbia; J. Boone Aiken, III, and James M. Saleeby, Jr., of Aiken, Bridges, Nunn, Elliott & Tyler, both of Florence; Stephan I. Voudris, of Jorden Burt, of Miami, FL; and

Franklin G. Burt, of Jorden Burt, of Washington, DC, for Appellant.

Edward L. Graham, Brian D. Phelan, and Sallie P. Phelan, all of Graham Phelan Law Offices, of Florence, for Respondent.

Elizabeth Van Doren Gray and Tina Cundari, both of Sowell, Gray, Stepp & Laffitte, of Columbia; Gray T. Culbreath, of Collins & Lacy, of Columbia; David T. McDowell and Alana K. Pulaski, both of Bracewell & Guiliani, of Houston, TX; for Amicus Curiae.

Chief Justice TOAL.

In this case, a policyholder brought causes of action for breach of contract and bad faith rescission against his insurance company, and sought actual and punitive damages for the company's termination of his health care insurance from original issuance on the grounds of a purported misrepresentation. The jury awarded the policyholder $36,000 in actual damages on the breach of contract claim, $150,000 in actual damages on the bad faith rescission claim, and $15 million in punitive damages deriving from the bad faith cause of action. This appeal followed.

### FACTUAL BACKGROUND

On May 15, 2001, Respondent Jerome Mitchell, Jr. ("Mitchell"), of Florence, submitted an application for health insurance to Appellant Fortis Insurance Company ("Fortis"). Mitchell, who was seventeen years old at the time, was preparing to attend college and was no longer covered under his mother's health insurance policy. The application required him to answer a medical questionnaire, which included the question: "Been diagnosed as having or been treated for any immune deficiency disorder by a member of the medical profession?" Mitchell answered "no" to this question. Fortis issued Mitchell a health insurance policy.

In April 2002, Mitchell attempted to donate blood to the Red Cross. On May 13, 2002, the Red Cross contacted Mitchell to inform him that his blood had screened positive for HIV. The Red Cross suggested Mitchell get a confirmation test from his personal physician, and Mitchell immediately

contacted Dr. Michael Chandler. On May 14, 2002, Dr. Chandler's tests confirmed that Mitchell was HIV positive. That day, one of Dr. Chandler's assistants noted on Mitchell's intake chart: "Gave blood in March—got letter yesterday stating blood tested [positive for] HIV." The handwritten chart note identified Mitchell correctly as eighteen years old, but was erroneously dated May 14, 2001.

Dr. Chandler referred Mitchell to Dr. Kevin Shea, an infectious disease specialist with Carolina Health Care ("Carolina"). On May 23, 2002, Dr. Shea met with Mitchell and recorded Mitchell's medical history as follows:

> Mr. Mitchell is an 18 year old African–American male with no past medical history who apparently tried to donate blood in April of this year. He was noted to be HIV positive. Subsequent confirmation through Dr. Chandler's office included a positive ELISA and Western Blot. He is referred at this time for further evaluation.

Fortis soon received claims for Mitchell's treatment and for the blood testing that indicated Mitchell was HIV positive. Pursuant to company policy in cases involving long-term disease, Fortis launched an investigation to determine whether Mitchell had failed to disclose a pre-existing condition on his policy application.

In June 2002, a Fortis investigator contacted Mitchell to request that he identify his healthcare providers and authorize a medical records release. Mitchell did so, and Fortis contacted Carolina and Dr. Shea to obtain Mitchell's medical records and billing information. Carolina sent Fortis copies of Dr. Chandler's records, Dr. Shea's records, and Mitchell's blood test results.

A Fortis investigator reviewed the records and discovered the erroneously-dated intake note in Dr. Chandler's files. That information was then forwarded to Fortis Senior Underwriter Kate Stephens ("Stephens") for review. Stephens completed a "referral summary" for the rescission committee and recommended that Mitchell's policy be rescinded on the grounds that he had misrepresented his HIV positive status. Stephens's summary referenced the handwritten notation on the intake form as the sole foundation for her recommendation. Some time shortly thereafter, a Fortis employee—in all

likelihood Stephens [1]—drafted an addendum to the referral summary, which read:

> The only question misrepresented on the Enrollment form is # 20—"Within the last 10 years has any proposed insured been diagnosed as having or been treated for any immune deficiency disorder." Can't use the question re: AIDS as he does not have AIDS, he has tested positive for the HIV virus. This is the only question I've found that we can use—any other suggestions?

> Technically, we do not have the results of the HIV test. This is the only entry in the medical records regarding HIV status. Is this sufficient?

The referral summary and addendum were sent to Fortis's rescission committee ("the committee"). On September 4, 2002, the committee conducted an approximately two-hour meeting, in which they considered forty-six cases, including Mitchell's. When it came time to consider Mitchell's case, the committee considered Stephens' referral summary and the addendum. The committee voted to rescind Mitchell's policy.

On September 5, 2002, Fortis sent Mitchell a letter informing him that his health insurance policy was rescinded due to a material misrepresentation on his application form. The letter stated that Fortis would "welcome any additional information you may have which would effect [sic] our decision to rescind your policy." Upon receiving the letter, Mitchell attempted to contact Stephens in order to inform her that he had not misrepresented his health status. Mitchell was directed to a customer service representative, who informed him that there was "nothing [the representative] could do" about the rescission.

Mitchell then sought the help of a case manager at the Hope Health free medical clinic. The manager called Stephens to inform her that she had medical records confirming that Mitchell first tested for HIV positive after he had purchased the Fortis policy. The manager offered to send these records to Stephens by fax or mail. Stephens spurned this offer and informed the manager "that there was nothing she could do at

---

1. The addendum was not signed. However, the record strongly supports the conclusion that Stephens was the author, a fact that Fortis neither admitted nor denied.

this time." [2] Stephens did not provide any information regarding Mitchell's right to an appeal.

On June 4, 2003, Mitchell's attorney sent Fortis a copy of Dr. Chandler's initial test results along with a letter informing Fortis that Mitchell was first diagnosed with HIV in May 2002. One week later, Fortis advised Mitchell's attorney that it would review his appeal. The rescission committee met to consider Mitchell's appeal. The information before the committee consisted of a single notation that read: "letter from attorney stating that the insured did not misrep[resent] coverage since the first diagnosis of AIDS was 5/14/2002." [3] The committee denied Mitchell's appeal and upheld the rescission.[4]

### PROCEDURAL BACKGROUND

On July 21, 2003, Mitchell filed this action for breach of contract and bad faith rescission of his health insurance, seeking actual and punitive damages.

At trial, Mitchell's insurance expert testified that it was Fortis's practice to shut down an investigation once a single piece of evidence was discovered that would support rescission. Further, Mitchell introduced testimony from Fortis's manager of underwriting and correspondence—Stephens's direct supervisor—who testified that she was "not able to answer" whether she or any of her employees "had a responsibility to find out the truth" about a policyholder's medical conditions. On cross-examination, Fortis's insurance expert conceded that an insurance company has a duty to investigate and find information that may lead to payment of a claim.

In light of this testimony, Mitchell argued that Fortis acted in bad faith in rescinding his policy solely on the basis of the handwritten note from Dr. Chandler's files. Mitchell argued

---

**2.** Stephens had a similar conversation with Mitchell's insurance agent, who called to inquire about the rescission at the request of Mitchell's mother. Stephens explained that Mitchell had misrepresented a preexisting condition on his application form, and provided no information regarding Mitchell's right to an appeal.

**3.** This notation was in error, as Mitchell was HIV positive, and did not have AIDS.

**4.** Fortis eventually reinstated Mitchell's policy on May 27, 2004, well after the litigation had begun.

that there was ample countervailing evidence in his medical records to put any reviewer on notice that the handwritten note was erroneously dated.[5] Mitchell contended that the rescission committee, presented with the "addendum," which openly acknowledged that the investigation had uncovered no clear evidence that Mitchell was HIV positive prior to the inception of his contract with Fortis, rescinded Mitchell's policy in the course of what was likely no more than a three-minute review.[6]

Mitchell also argued that Fortis had tried to conceal evidence of its bad faith and that Fortis had twice sent them an illegible copy of the addendum to the referral form, and that Stephens's call log included no entry for her phone call with the Hope Health case manager. Mitchell questioned Fortis's practice of not maintaining records of its referral forms in the same manner as other company documents.

As to Mitchell's actual and potential harm and the determination of damages, Mitchell presented testimony from a medical expert who testified that without medical treatment, he would contract AIDS in two years and likely die two years after that. Mitchell introduced testimony from a health care expert who testified to the minimum expected costs that it would take to care for Mitchell throughout his life, not including complications from HIV and AIDS. Mitchell also introduced an economist who relied on the health care expert's

---

5. Deborah Poston, an employee of Carolina, testified that when Mitchell's counsel notified her on March 8, 2004 that there might be an error on one of the records, she reviewed the medical chart and determined that there was a discrepancy in the date. Poston testified that it took her "five minutes" to verify the correct date. She further indicated that all records are kept chronologically, and that the misdated note was included with 2002 medical records. Other contextual clues included Mitchell's age on the note, which indicated he was eighteen (he would have been seventeen in 2001), the corresponding day and month with the other records from Dr. Chandler's office, and Dr. Shea's referral summary, which Fortis claimed it did not have but Mitchell alleged was in the file.

6. Mitchell introduced evidence that forty-five other cases were considered with Mitchell's in a single two-hour meeting. Mitchell thus argued that it was unlikely that the committee spent more than three minutes on any one case, including Mitchell's.

figures to project a total present value of $1,081,189.40 for Mitchell's treatment and costs.

The jury awarded Mitchell $186,000 in compensatory damages, including $36,000 on the breach of contract claim and $150,000 on the bad faith rescission claim. The jury also awarded $15 million in punitive damages for the bad faith rescission claim.

Fortis filed post-trial motions to (1) elect remedies; (2) vacate, or in the alternative, remit the punitive damages award; and (3) for judgment notwithstanding the verdict or, in the alternative, a new trial absolute, or in the alternative, a new trial *nisi remittitur*. The circuit court granted the motion to elect, and Mitchell elected actual and punitive damages on the bad faith cause of action. Following a hearing, the circuit court denied Fortis's remaining motions.

Fortis appealed and we certified the case pursuant to Rule 204(b), SCRAP. Fortis now submits the following questions for our review:

I. Did the $15 million punitive damages verdict violate Fortis's constitutional right to due process?

II. Did the circuit court admit improper evidence at trial?

III. Did the circuit court err in denying Fortis's motion for judgment notwithstanding the verdict?

IV. Was the jury's verdict a result of passion, caprice, or prejudice?

### STANDARD OF REVIEW

As a preliminary matter, we restate the standard of review appellate courts should apply to a trial court's post judgment due process review of a punitive damages award. We have typically applied an abuse of discretion standard in reviewing a trial court's post judgment review of a punitive damages award. *See Gamble v. Stevenson,* 305 S.C. 104, 112, 406 S.E.2d 350, 355 (1991) ("[O]nly when the trial court's discretion is abused, amounting to an error of law, does it become the duty of this Court to set aside the award."); *Hundley v. Rite Aid of South Carolina, Inc.,* 339 S.C. 285, 314, 529 S.E.2d 45, 61 (Ct.App.2000) (evaluating the trial court's post-judgment review and finding "no abuse of discre-

tion in the trial court's conclusions following its review of the jury verdict."). However, changes in the federal case law have persuaded us to adopt a de novo standard for the review of trial court determinations of the constitutionality of punitive damages awards.

In *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the United States Supreme Court held that courts of appeal should apply a de novo standard of review to district court determinations of the constitutionality of punitive damages awards. The Supreme Court identified three bases for its promulgation of a de novo review standard. First, the concepts involved in the due process analysis of punitive damages awards are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Cooper Industries*, 532 U.S. at 436, 121 S.Ct. 1678 (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). Second, the due process criteria acquire content only through application, and "independent review is therefore necessary if appellate courts are to maintain control of, and clarify, the legal principles." *Id.* (quoting *Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657). Third, "de novo review tends to 'unify precedent' and 'stabilize the law.'" *Id.* (quoting *Ornelas*, 517 U.S. at 697–98, 116 S.Ct. 1657). We agree with this analysis.

For the reasons articulated in *Cooper Industries*, we find that determinations of the constitutionality of punitive damages awards are best conducted pursuant to a de novo review. Accordingly, we hold that our appellate courts must conduct a de novo review when evaluating the constitutionality of a punitive damages award. *Cooper Industries*, 532 U.S. at 431, 121 S.Ct. 1678.

## Law/Analysis

### I. Due Process and Punitive Damages

Fortis argues that the $15 million punitive damages award is so excessive as to violate its constitutional right to due process under the standards set forth in *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991) (hereinafter "*Gamble*"), and *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct.

1589, 134 L.Ed.2d 809 (1996) (hereinafter *"Gore"*). We agree with this conclusion, although our analysis differs substantially from that urged by Fortis.

### A. The History of Due Process Limitations on Punitive Damages Awards

The practice of awarding punitive damages originated in principles of common law "to deter the wrongdoer and others from committing like offenses in the future." *Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 393, 134 S.E.2d 206, 210 (1964). "Punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568, 116 S.Ct. 1589. The state's interests in awarding punitive damages must remain consistent with the principle of penal theory that "the punishment should fit the crime." *Atkinson v. Orkin Exterminating Co., Inc.*, 361 S.C. 156, 164, 604 S.E.2d 385, 389 (2004) (quoting *Mathias v. Accor Economy Lodging Inc. and Motel 6 Operating L.P.*, 347 F.3d 672, 676 (7th Cir.2003)).

Nevertheless, "while states possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards." *State Farm v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417, 123 S.Ct. 1513.

Prior to *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the United States Supreme Court had never directly considered the matter of whether a punitive damage award could be so excessive as to violate due process. In *Haslip*, the Court held that a punitive damages award more than four times the amount of compensatory damages did not violate the defendant's due process rights. However, the Court acknowledged that unlimited discretion in the fixing of punitive damages may invite extreme results that violate due process. The Court noted that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter

into the constitutional calculus." *Id.* at 18, 111 S.Ct. 1032. Since *Haslip,* the Court has built a healthy body of jurisprudence that adds substance and context to this area of law. *See TXO Production Corp. v. Alliance Resources,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (holding that the harm likely to occur from a defendant's conduct was relevant to the due process inquiry); *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) (holding that due process requires post-judgment review of a punitive damages award); *Gore,* 517 U.S. 559, 116 S.Ct. 1589 (identifying three "guideposts" that assist a due process analysis); *Cooper Industries v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (adopting a de novo standard of review for determining the constitutionality of punitive damages awards); *Campbell,* 538 U.S. 408, 123 S.Ct. 1513 (identifying evidence that, if used to support a punitive damages award, will violate due process); *Philip Morris USA v. Williams,* 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (holding that a punitive damages award that is based on harm to others violates due process).

The Supreme Court expounded upon *Haslip*'s due process standard in *Gore,* where it held that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. In *Gore,* the Court first adopted a specific test by which to conduct a due process analysis. The Court established three guideposts that indicate whether the due process requirement of fair notice has been met. In determining the constitutionality of a punitive damages award, *Gore* directed that courts consider: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 575, 116 S.Ct. 1589.

Since *Gore,* much of the Supreme Court's punitive damages jurisprudence has focused on the type of evidence

that may be used to support a punitive damages award. In *Campbell*, the Supreme Court held that punitive damages awards may not be based on out-of-state conduct and must be related to the plaintiff's injury or damage. "A State cannot punish a defendant for conduct that may have been lawful where it occurred.... Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." *Campbell*, 538 U.S. at 421–22, 123 S.Ct. 1513. Furthermore, "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* at 423, 123 S.Ct. 1513.

Similarly, in *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007), the Court held that a punitive damages award that is based on evidence of harm to persons other than the plaintiff or plaintiffs will violate due process. The Court noted that harm to others may be considered to help show that the conduct that caused the plaintiff's harm also posed a risk to the public, but the jury may not go further and base a punitive damages award on that evidence.

In these cases, the Supreme Court has continued to uphold *Haslip* and further delineate the contours of punitive damages awards that "run wild." *Haslip*, 499 U.S. at 19, 111 S.Ct. 1032. Nevertheless, the Court has consistently declined to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 18, 111 S.Ct. 1032.

### B. *Gamble* and Punitive Damages Review Under South Carolina Law

Our own jurisprudence has largely tracked the Supreme Court's constitutional pronouncements, beginning with our *Gamble* opinion, which was written in response to *Haslip*. In *Gamble*, we identified eight considerations that trial courts should apply in conducting a post-judgment due process review of any punitive damages award. These considerations are: (1) the defendant's degree of culpability; (2) the duration of the conduct; (3) the defendant's awareness or concealment; (4) the existence of similar past conduct; (5) the likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely

to result from such conduct; (7) the defendant's ability to pay; and (8) any other factors deemed appropriate. *Gamble,* 305 S.C. at 111–12, 406 S.E.2d at 354.

We have said in the past that trial courts must consider both the *Gamble* and the *Gore* factors. *James v. Horace Mann Ins. Co.,* 371 S.C. 187, 195, 638 S.E.2d 667, 671 (2006) ("Although we find the punitive damages award was reasonable under the *Gamble* factors, we must also review the trial court's ruling on punitive damages under *Gore* "). However, considerations of judicial economy weigh in favor of a less burdensome and duplicative analysis. We now hold that *Gamble* remains relevant to the post-judgment due process analysis, but only insofar as it adds substance to the *Gore* guideposts. With these considerations in mind, we articulate the following test for our courts in conducting a post-judgment review of punitive damages awards.

### 1. Reprehensibility

First, any court reviewing a punitive damages award should consider the degree of reprehensibility of the defendant's conduct. Reprehensibility is "perhaps the most important indicium of the reasonableness of a punitive damages award." *Gore,* 517 U.S. at 565, 116 S.Ct. 1589. "This principle reflects the view that some wrongs are more blameworthy than others." *Id.* In considering reprehensibility, a court should consider whether: (i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident.[7] *Campbell,* 538 U.S. at 419, 123 S.Ct. 1513.

### 2. Ratio

Second, the court should consider the disparity between the actual or potential harm suffered by the plaintiff

---

7. We observe that this analysis adequately encompasses—and obviates the need for—the first four factors of the *Gamble* review, which include the defendant's degree of culpability, the duration of the conduct, the defendant's awareness or concealment, and the existence of similar past conduct.

and the amount of the punitive damages award. The ratio of actual or potential harm to the punitive damages award is "perhaps the most commonly cited indicium of an unreasonable or excessive punitive damages award." *Gore*, 517 U.S. at 580, 116 S.Ct. 1589. Although the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," and has consistently declined to adopt a bright line ratio or simple mathematical test, the Court has remarked that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513. Nevertheless, the Supreme Court has made clear that "there are no rigid benchmarks that a punitive damages award may not surpass," so long as "the measurement of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and the general damages recovered." *Id.* at 425–26, 123 S.Ct. 1513. With this instruction in mind, we note that a court, when determining the reasonableness of a particular ratio of actual or potential harm to a punitive damages award, may consider: the likelihood that the award will deter the defendant from like conduct; whether the award is reasonably related to the harm likely to result from such conduct; and the defendant's ability to pay.[8] Nevertheless, a court may not rely upon these considerations to justify an otherwise excessive punitive damages award.

### 3. Comparative Penalty Awards

 Third, the court should consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. When identifying "comparable cases" a court may consider: the type of harm suffered by the plaintiff or plaintiffs; the reprehensibility of the defendant's conduct; the ratio of actual or poten-

---

8. We caution that trial courts must be careful about considering the net worth of the defendant. Wealth cannot justify an otherwise unconstitutional punitive damages award. *Campbell*, 538 U.S. at 427, 123 S.Ct. 1513. While the ability to pay remains relevant to the post-judgment due process review, a punitive damages award should never be based solely on a percentage of the defendant's net worth.

tial harm to the punitive damages award; the size of the award; and any other factors the court may deem relevant.

## Post–Judgment Due Process Review In the Instant Case

### 1. Reprehensibility

 Turning to the facts of the instant case, we find ample support in the record to establish that Fortis's conduct was reprehensible.

First, Mitchell's harm was economic, rather than physical. This would typically weigh against the reprehensibility of Fortis's conduct. However, this case is unique in that Mitchell's economic harm—the termination of his health insurance policy—exposed him to great risk of physical danger.

Second, this truth is also relevant to the consideration of whether Fortis demonstrated an indifference to Mitchell's life and a reckless disregard to his health and safety. We conclude that Fortis did. The record is clear that a person with HIV, without proper medication, will develop AIDS and die within a relatively short time. But for the free medical services provided by Hope Health, Fortis's conduct would have deprived Mitchell of health insurance for at least three years, during which time his health would have surely deteriorated. The jury could have reasonably inferred from the evidence that Fortis deliberately ignored contextual and other evidence in order to rescind Mitchell's policy on the pretext of a misrepresentation. It was reasonable to conclude, from the evidence presented, that Fortis was motivated to avoid the losses it would undoubtedly incur in supporting Mitchell's costly medical condition. Based upon this evidence, we find that Fortis was deliberately indifferent to its contractual obligations and to Mitchell's health and wellbeing.

Third, Mitchell was financially vulnerable. Again, without the assistance of free medical services, Fortis's actions would have rendered him unable to obtain additional insurance.

Fourth, Fortis's conduct involved repeated acts of deliberate indifference for more than two years. Fortis reinstated Mitchell's policy nearly twenty months after it had been put on notice that the evidence upon which it relied was erroneous. The rescission committee decided to reject Mitchell's appeal

even after his attorney contacted Fortis to emphasize the significance of the medical records which demonstrated that Mitchell had not misrepresented his condition at the time he applied for the policy.

Finally, there is ample evidence in the record to support a finding that the harm Mitchell suffered was a result of intentional deceit. Stephens' addendum acknowledged that the investigation yielded no clear evidence to establish that Mitchell's HIV positive status predated his policy with Fortis. The rescission committee, when presented with this information, elected to rescind Mitchell's policy. After the initial rescission, Stephens was contacted by Mitchell, Mitchell's Hope Health case worker, Mitchell's mother's insurance agent, and Mitchell's attorney to inform her that her information was inaccurate. Stephens did not appear at trial, and the jury was justified in drawing a negative inference from her unavailability.

Fortis's refusal to conduct a further investigation suggests that it was aware of its own wrongdoing. Furthermore, the lack of written rescission policies, the lack of information available regarding appeal rights or procedures, the separate retention policies for rescission documents, the omission of the case manager's call from Stephens' phone log, and the inference evident from the record that Fortis was in possession of Dr. Shea's records as early as the summer of 2002, were all evidence that Fortis tried to conceal the actions it took in rescinding Mitchell's policy.

Based on these findings, we conclude that Fortis's conduct was highly reprehensible and that the imposition of punitive damages was appropriate.

## 2. Ratio

In reviewing the ratio guidepost, a court need not always compare the punitive damages award to the actual damages awarded, but in certain cases may compare it to the *potential* harm suffered by the plaintiff. The Supreme Court squarely addressed this issue in *TXO*, where the petitioner had brought a frivolous claim against the respondent's oil and gas rights in an effort to renegotiate its royalty arrangement with the respondent. 509 U.S. 443, 113 S.Ct. 2711, 125

L.Ed.2d 366. The jury in that case awarded $19,000 in actual damages and $10 million in punitive damages. The petitioner argued on appeal that the 526 to 1 ratio was grossly excessive, but the Supreme Court found that there was ample evidence in the record to support an inference that petitioner was seeking a multimillion dollar reduction in its potential royalty obligation. The Supreme Court held that "it is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* at 460, 113 S.Ct. 2711. Although the Court did not designate a monetary value to the potential harm suffered by the respondent, it found that even the most conservative approximations—each falling within a single-digit ratio to the $10 million punitive damages award—did not "jar one's constitutional sensibilities." *Id.* at 462, 113 S.Ct. 2711.

Turning once again to the present case, there is ample evidence that Fortis's conduct would have potentially resulted in a great deal of harm to Mitchell if not for the free medical services of Hope Health. In reviewing the ratio guidepost, the circuit court found that because Mitchell's lifetime maximum payout on the rescinded health insurance policy was $6 million, "the potential economic loss to [Mitchell] from the wrongful rescission was thus" at least that amount. However, in this de novo review, we need not—and in this case should not—accept the circuit court's assertion that Mitchell suffered $6 million in potential harm. This figure is unsupported by the evidence and too speculative. Rather, the more appropriate measure of potential harm, supported by the evidence, is the present value of cost for the minimal evaluation and treatment of HIV over Mitchell's lifetime—$1,081,189.40. This figure bears a closer relation to Mitchell's potential risk than the $6 million maximum lifetime payout. It also bears a closer relation to the reprehensibility of Fortis's conduct because this figure represents the minimal pecuniary gain to Fortis in rescinding the policy. For these reasons, $1,081,189.40 is the accurate measure of the potential harm to which Fortis exposed Mitchell and is appropriately considered in evaluating the ratio to the punitive damages award.

 The next question we must ask is whether a ratio of 13.9 to 1, based upon the $15 million punitive damages award and $1,081,189.40 in potential harm, is grossly excessive. We conclude that it is.

In *Campbell,* the Supreme Court observed that "when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outer limits of the due process guarantee." 538 U.S. at 425, 123 S.Ct. 1513. Although the determination of whether a compensatory damage award is "substantial" is necessarily an imprecise and relative inquiry, it is safe to say that Mitchell's $150,000 in actual damages—excluding, for the moment, the $1,081,189.40 in potential harm suffered—is a fairly substantial compensatory damage award in South Carolina.

With that in mind, we find that a 13.9 to 1 ratio, in this particular case, exceeds due process limits. There is ample evidence in the record to support the imposition of punitive damages, and there is no need for further findings of fact. However, in order to determine the proper amount to remit, we must turn to the third *Gore* guidepost, which instructs us to compare the present award to civil penalties imposed in similar cases.

### 3. Comparative Penalty Awards

 Although a thorough review of case law has uncovered no cases on all fours factually with the present case, South Carolina has a substantial, if somewhat dated, history of upholding punitive damages awards against insurance companies that fraudulently rescind their customers' health insurance policies. *See Kinard v. United Ins. Co.,* 237 S.C. 266, 116 S.E.2d 906 (1960) (where the jury awarded $200 in actual damages and $1,300 punitive damages against an insurer who stopped collecting the premiums from the insured, with knowledge from the claims filed and from the agent's observation that the insured was near death, so that the policy would lapse); *Yarborough v. Bankers Life & Casualty Co.,* 225 S.C. 236, 81 S.E.2d 359 (1954) (where the jury awarded $7.50 in actual damages and $1,000 in punitive damages against an insurer who repudiated a health insurance policy by failing to send a notice of premiums due after the insured filed a claim for gallbladder trouble, and attempted to have the insured

agree to a retroactive rider excluding illnesses resulting from gall-bladder trouble); *Riley v. Life & Casualty Ins. Co.,* 184 S.C. 383, 192 S.E. 394 (1937) (where the jury awarded $36 in actual damages and $1,000 in punitive damages against an insurer who stopped collecting premiums from the insured after it was clear that his health was failing and with the obvious intention to cancel the life insurance policy); [9] *Jamison v. American Workmen Ins. Co.,* 169 S.C. 400, 169 S.E. 83 (1933) (where the jury awarded $20 in actual damages and $480 in punitive damages against an insurer who stopped notifying the insured when premiums were due after the insured became very ill in hopes that the insured would miss a payment and thereby justify rescission).

In reviewing more recent punitive damages awards, South Carolina courts have most often upheld verdicts on the low end of the single-digit spectrum, but have frequently deviated from this norm in cases involving particularly egregious conduct.[10] *See James,* 371 S.C. at 196–97, 638 S.E.2d at 671–72 (upholding a 6.82 to 1 ratio); *Mackela v. Bentley,* 365 S.C. 44, 614 S.E.2d 648 (Ct.App.2005) (upholding a 3.75 to 1 ratio); *Austin v. Specialty Transp. Services, Inc.,* 358 S.C. 298, 594 S.E.2d 867 (Ct.App.2004) (upholding a 2.54 to 1 ratio); *Collins Entertainment Corp. v. Coats & Coats Rental Amusement,* 355 S.C. 125, 584 S.E.2d 120 (Ct.App.2003) (upholding a 9.96 to 1 ratio); *Cock–N–Bull Steak House, Inc. v. Generali Ins. Co.,* 321 S.C. 1, 466 S.E.2d 727 (1996) (upholding a 28 to 1 ratio). *Cf. Atkinson,* 361 S.C. at 170, 604 S.E.2d at 392–93 (overruling a 127 to 1 ratio).

In our view, the conduct in this case was reprehensible enough to merit an award towards the outer limits of the single-digit ratio. *See Campbell,* 538 U.S. at 425, 123 S.Ct. 1513 (observing that few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process). Fortis willfully disregarded Mitchell's health and

---

9. These humble verdicts appear quaint in light of today's multimillion dollar awards. Nevertheless, it helps to keep in mind that this $1,000 punitive damages award was imposed for breach of a contract involving only $155 in life insurance, paid at a weekly premium of 25 cents.

10. Fortis is correct to observe that most of South Carolina's punitive damages awards have been on the low end of the single-digit-ratio spectrum. That does not mean the constitution requires this to be so.

safety, and the jury so found in assessing this punitive damages award. In assessing this remittitur, we place great emphasis upon that consideration.

We therefore remit the punitive damages award to $10 million, resulting in a ratio of 9.2 to 1. We believe a $10 million award in this case satisfies due process and comports with South Carolina law. We are also certain that a $10 million award will adequately vindicate the twin purposes of punishment and deterrence that support the imposition of punitive damages.

## II. Evidence at Trial

Fortis argues that the judgment should be vacated, or judgment rendered in its favor, because the circuit court erred in admitting certain evidence. We disagree.

### A. Other Rescissions

Fortis argues that the circuit court allowed the jury to consider evidence that the rescission committee harmed nonparties to the suit, in violation of its constitutional rights. *See Campbell,* 538 U.S. at 420, 123 S.Ct. 1513. Fortis asserts that the jury should not have considered evidence indicating that forty-five other rescission cases were considered with Mitchell's in the course of a two-hour committee meeting. This argument is without merit. It is evident from the record that Mitchell introduced this evidence in order to establish the inference that Fortis could not have spent more than three minutes in deliberating the rescission of Mitchell's policy. Fortis could have defended itself from such evidence had the rescission committee kept minutes in its meetings. The circuit court did not err in allowing this evidence.

### B. Post-claim Underwriting

Fortis argues that the circuit court erred in allowing testimony regarding Fortis's retrospective investigation practices, also known as "post-claim underwriting." Fortis asserts that expert testimony indicating that this practice is unlawful in "at least half a dozen states" constituted evidence of out-of-state conduct that violated Fortis's constitutional right to due process. *See Campbell,* 538 U.S. 408, 123 S.Ct. 1513. We disagree.

Fortis argues that, as a general matter, post-claim underwriting is "perfectly lawful" in South Carolina. However, in the context of this case, Fortis's post-claim underwriting practices played a pivotal role in the harm inflicted upon Mitchell in South Carolina. This evidence was probative of Fortis's bad faith conduct, and was properly submitted to the jury.

## C. Improper Litigation Conduct

Fortis argues that the trial court erred in allowing the jury to consider evidence that Fortis engaged in "improper conduct" following the September 4, 2002 rescission committee meeting on the grounds that "dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *Campbell*, 538 U.S. at 422, 123 S.Ct. 1513. We disagree for three reasons.

First, the rescission was not final until June 2003 review of Mitchell's "appeal." At a bare minimum, all evidence of concealment until that point is allowable. Second, this evidence is probative of Fortis's bad faith liability, not punitive damages. Lastly, Fortis waived any objection to the admission of evidence of bad acts that occurred after the second rescission committee meeting by: (1) repeatedly emphasizing their own "good act" of reinstatement following the "temporary" rescission, and (2) repeatedly arguing that Mitchell himself acted negligently in failing to submit additional information prior to March 8, 2004.

## D. Value of Mitchell's Free Medical Treatment

Fortis argues that the circuit court erred in allowing the jury to consider the value of the free medical care Mitchell received from Hope Health. We disagree.

The value of Mitchell's free medical care is relevant to the determination of damages because the collateral source rule provides that an award for damages should not be decreased if the plaintiff receives compensation for all or part of the damage from a collateral source. *See Haselden v. Davis*, 353 S.C. 481, 579 S.E.2d 293 (2003) (holding that the proper measure of damages is the "reasonable value" of the medical services, even if the plaintiff receives the treatment free or at a discount). In this case, the value of Mitchell's free medical

treatment is necessary to the determination of the amount of damage Fortis inflicted upon Mitchell in rescinding his policy.

### E. Mitchell's Future Medical Expenses

 Fortis argues that the circuit court erred in allowing the jury to consider the value of the Mitchell's future medical expenses. This objection, however, is merit less. This evidence is probative of Fortis's financial motive to rescind Mitchell's policy, and we find it is relevant to Mitchell's allegations of bad faith.

### F. Mitchell's Risk of Death Without Appropriate Medication

 Fortis argues that the circuit court erred in allowing the jury to consider the risk of death Mitchell faced without treatment, because it was "irrelevant, highly prejudicial, and . . . inflamed the jury." We find this assertion to be entirely without merit. Evidence of the risk Mitchell faced without health insurance coverage is properly admissible to establish Fortis's reprehensibility and support an award for punitive damages.

### III. Fortis's Motion for JNOV

We find it patently clear from the record that there is no support for Fortis's claim that "the evidence as a whole is susceptible to only one reasonable inference" that Fortis was not liable for bad faith rescission of Mitchell's health insurance policy.

### IV. Passion, Caprice, and Prejudice

Similarly, we find no credible evidence anywhere in the record to support Fortis's contention that "the jury's $15 million punitive damages award and/or its $150,000 compensatory damages award were the result of passion, caprice, or prejudice, and therefore must be reversed and a new trial ordered."

### CONCLUSION

For the forgoing reasons, we affirm the jury's finding of liability on the bad faith cause of action, affirm the $150,000

compensatory damages award, and remit the $15 million punitive damages award to $10 million.

WALLER, PLEICONES, BEATTY and KITTREDGE, JJ., concur.