714 S.E.2d 904

Glenn Y. HOLLIS, Jr., John E. Hollis, Joseph R. Robinson,
and Janette H. Robinson, Respondents,

v.

STONINGTON DEVELOPMENT, LLC, Appellant.

No. 4869.

Court of Appeals of South Carolina.

Heard March 9, 2011.
Decided Aug. 17, 2011.

386

388

Timothy G. Quinn, of Columbia, for Appellant.

H. Freeman Belser and Clinch H. Belser, Jr., both of Columbia, for Respondents.

FEW, C.J.

The primary issue in this appeal is whether the trial court erred in imposing punitive damages of $3.5 million against Stonington Development, LLC. We find the trial court properly denied Stonington's motion for a directed verdict as to punitive damages, and we find no reversible error in the charge given to the jury. However, we find the amount of punitive damages is excessive and therefore that due process requires the amount of the award to be reduced. As to all other issues, we affirm.

## I. Facts

The plaintiffs are brothers Glenn and John Hollis; Janette Robinson, who is Glenn's daughter; and Janette's husband, Joseph Robinson. The Hollises and Robinsons jointly own approximately nineteen acres of land that has been in the Hollis family for generations. The Robinsons live on the property with their son in a house overlooking two ponds that Glenn, John, and their father built over fifty years ago. The only driveway to the Robinsons' home crosses an earthen dam that divides the three-acre upper pond from the five-acre lower pond.

In 1999, Stonington purchased property directly upstream from the Hollis and Robinson property for the purpose of developing a residential subdivision. The Hollises and Robinsons proved at trial that over the next five years Stonington ignored the recommendations of its own stormwater management engineers; violated State regulations and local laws regarding erosion control and stormwater runoff; and misled them, perhaps even lied, about Stonington's intention to remedy the problems. The result was severe flooding on the Hollises and Robinsons' property, which inhibited the Robinsons' access to their home and filled the ponds with as much as four feet of sediment. The estimated cost to restore the property is over $250,000.00. The jury awarded $400,000.00 in

actual damages and $3.5 million in punitive damages. The trial court reduced the actual damages award to $315,000.00 as a setoff to account for funds paid by other settling defendants.

The troubles between the parties began in 2000, shortly before Stonington began construction. At their first meeting, Stonington asked the Robinsons to relinquish easement rights for their driveway and asked if it could put a sewer line through their front yard to serve the development. When the Robinsons refused both requests, Stonington threatened to condemn the land and install the sewer line anyway.[1]

Before beginning construction, Stonington hired Power Engineering to prepare stormwater management plans for the subdivision. The Hollises and Robinsons' expert testified that stormwater management is a field of engineering that prevents the type of severe flooding, erosion, and sediment accumulation that eventually occurred on the Hollis and Robinson property. The plans Power Engineering prepared for Stonington included protective measures such as silt fences and detention ponds to catch eroding soil and sediment runoff. Stonington failed to follow the plans, despite its admitted responsibility to do so.

By late 2002, the Hollises and Robinsons started to see silt and sediment coming from the development and accumulating in the ponds. Around the same time, Stonington received its first notice of violation from Richland County, requiring it to alleviate the accumulation in the ponds to avoid penalties. By the spring of 2003, the runoff worsened to the point of causing the ponds to flood the Robinsons' yard and cover part of their driveway with rushing water. The Hollises and Robinsons continually complained to Stonington and asked it to fix the problem. Stonington assured them the problem would be fixed, but failed to take action.

A Stonington employee testified that, as part of its attempt to compromise with the Hollises and Robinsons, Stonington placed a fifty-foot-wide conservation easement on the part of its property bordering the Hollises and Robinsons to provide them with a buffer for protection from the runoff. Stonington told them the buffer increased the size of their property

---

1. Stonington is a nongovernmental entity with no power to condemn private property.

because it could never be used for anything but trees. In direct contravention of that statement, Stonington then removed all of the trees in the "buffer" to install a sewer line for its subdivision. Stonington received a $1 million tax deduction for creating the easement.

After numerous other State and County violation notices and no action from Stonington to alleviate the damage, the Hollises and Robinsons finally filed suit against Stonington and Power Engineering[2] on July 29, 2005, for negligence, trespass, private nuisance, and violation of the Unfair Trade Practices Act. By then, the runoff from Stonington caused the back of the dam on the upper pond to collapse, and the sediment in the pond had accumulated as deep as four feet in some locations. Even after the lawsuit was filed, Stonington received violation notices from Richland County directing it to protect the ponds from stormwater runoff.

At trial, the Hollises and Robinsons' expert in stormwater management testified that Stonington did not follow Power Engineering's stormwater management plans and failed to maintain the limited stormwater management system it did build. Stonington's only representative to testify at trial admitted it was responsible for complying with the stormwater management plans. The Hollises and Robinsons' expert testified that while the Hollises and Robinsons may still have experienced some problems if Stonington had followed the plans and maintained the system, the problems would have been "significantly" less serious. The expert gave an example of Stonington's failure to follow the plans. He explained that the stormwater system as designed includes a temporary check dam to catch sediment after a rainstorm. The system then requires the check dam be cleaned out and the sediment hauled elsewhere. The expert said Stonington cleaned out the sediment, but then "piled it right on the slope right above it[,] ... obviously making it available for a source of erosion the next time it rains."

---

2. The Hollises and Robinsons also sued Ecological Associates, Inc., Newman Construction, Inc., and C.G.D. Developers, Inc. They settled with these defendants for a total of $85,000.00 and proceeded to trial against only Stonington and Power Engineering.

The Hollises and Robinsons presented evidence that the cost of repairing the damage caused by Stonington and restoring the ponds to their previous condition is $254,384.00,[3] in addition to the $9,813.76 in expenses they incurred before the trial. They also established damages for loss of use and enjoyment of the ponds. For example, Glenn testified the fishing in the ponds is now bad, the children cannot swim in the mud, and they can no longer access areas of the ponds due to the sediment accumulation.

## II. Procedural History

At the end of a five-day trial, the jury returned a defense verdict for Power Engineering, but found for the Hollises and Robinsons against Stonington for negligence, trespass, and private nuisance.[4] The jury awarded $400,000.00 in actual damages and $3.5 million in punitive damages. After the verdict, the Hollises and Robinsons elected the private nuisance cause of action. Stonington filed a post-trial motion for judgment notwithstanding the verdict or, in the alternative, new trial absolute or new trial nisi remittitur. The trial court denied the motion and, after conducting a review of the punitive damages award, upheld the constitutionality of the amount of the award. Stonington appeals alleging the trial court erred in (1) denying its motion for a directed verdict on punitive damages, (2) giving an erroneous jury charge on punitive damages, (3) imposing a punitive damages award that violates Stonington's due process rights, and (4) denying its post-trial motion for judgment or a new trial. We affirm the award of punitive damages and the denial of Stonington's post-trial motion. However, we find the amount of the punitive damages award to be excessive, and reduce the award to $2 million.

## III. Directed Verdict on Punitive Damages

When ruling on a directed verdict motion as to punitive damages, "the circuit court must view the evidence

---

3. This includes the cost of obtaining necessary permits, removing the silt, restoring the dam, and restocking the fish.

4. The trial judge granted a directed verdict in favor of Stonington on the unfair trade practices cause of action.

and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party." *Mishoe v. QHG of Lake City, Inc.*, 366 S.C. 195, 200, 621 S.E.2d 363, 366 (Ct.App.2005) (finding sufficient evidence to submit the issue of punitive damages to the jury). "In reviewing the denial of a motion for directed verdict . . ., the appellate court applies the same standard as the circuit court." *Id.* "The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton." 366 S.C. at 201, 621 S.E.2d at 366.

■ The record contains evidence that Stonington ignored regulations regarding erosion control, stormwater runoff, and even its own engineer's plans; took no action to prevent or correct damage it knew it was causing to the ponds; and used threats and deception to avoid the consequences of its misconduct. The trial judge, who had the benefit of observing the witnesses and the presentation of evidence first-hand, summarized the evidence of punitive damages in his post-trial order as follows:

[T]he Court finds that there was ample evidence presented at trial . . . upon which the jury could have based its award of punitive damages, such as (1) the testimony by the plaintiffs about pre-construction meetings between Stonington and the plaintiffs where the plaintiffs expressed concern about the potential environmental impact of Stonington's development on their properties and ponds, (2) the testimony by the plaintiffs about meetings between the plaintiffs and Stonington after construction activities began expressing concern for damage actually occurring at that time, (3) the DHEC and Richland County inspection reports and correspondence demonstrating that Stonington failed to maintain its stormwater management plan, even after being put on notice by the County and by DHEC of the offsite impact, (4) the testimony of Dr. Meadows about the extreme inadequacies of Stonington's maintenance of the stormwater management system even after the lawsuit was filed, and (5) the testimony from the plaintiffs of Stonington's attempted bullying and threats to the plaintiffs about the location of the development's sewer line and the relocation of the plaintiffs' ingress/egress easement.

We find the trial judge correctly denied the motion because, viewing the evidence in the light most favorable to the Hollises and Robinsons, the jury had ample evidence from which to find Stonington acted in reckless disregard of the rights of others.

## IV. Punitive Damages Jury Charge

Stonington objected to a portion of the beginning of the jury charge on damages in which the trial judge said:

> Now, members of the jury, I'm going to talk to you a little bit about damages. And in this case we have actual damages and we have punitive damages as to both Defendants.

Stonington argued the charge required the jury to find actual and punitive damages as to both defendants. We find no reversible error.

 "When an appellate court reviews an alleged error in a jury charge, it 'must consider the court's jury charge as a whole in light of the evidence and issues presented at trial.'" *Ardis v. Sessions*, 383 S.C. 528, 532, 682 S.E.2d 249, 250 (2009) (quoting *Keaton ex rel. Foster v. Greenville Hosp. Sys.*, 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999)). "If, as a whole, the charges are reasonably free from error, isolated portions which might be misleading do not constitute reversible error." *Keaton,* 334 S.C. at 497, 514 S.E.2d at 575.

 Throughout the damages charge, the trial court made numerous statements indicating that the jury was not required to award actual or punitive damages.

> Members of the jury, *if* actual damages are found, ... exemplary or punitive damages will be allowed.... [I]n this case, the Plaintiff is seeking punitive damages in addition to actual damages.
>
> . . . .
>
> [P]unitive damages can *only* be awarded when the Plaintiff proves by clear and convincing evidence the Defendant's actions were willful, wanton, malicious, or in reckless disregard of the Plaintiff's rights.
>
> . . . .

> *Before you can award* punitive damage, members of the jury, you must first find that the Plaintiff is entitled to actual or nominal damages.

Considered in isolation, the sentence to which Stonington objected might be misleading. However, considering the charge as a whole, the trial court adequately explained to the jury that it could not award actual or punitive damages unless the plaintiffs met the applicable burden of proof. In the context of the entire charge, we find the sentence at issue was merely transitional, serving as an introduction to the damages portion of the charge.[5] *See Wells v. Halyard*, 341 S.C. 234, 239, 533 S.E.2d 341, 344 (Ct.App.2000) (finding a statement which "potentially could mislead the jury if taken out of context, . . . was merely introducing [a] concept"). Accordingly, we find no reversible error.

### V. Constitutionality of the Punitive Damages Award

■ Stonington challenges the constitutionality of the amount of punitive damages. Therefore, we are required to determine whether the award of punitive damages in this case is consistent with due process. *James v. Horace Mann Ins. Co.*, 371 S.C. 187, 194, 638 S.E.2d 667, 670 (2006); *see Mitchell v. Fortis Ins. Co.*, 385 S.C. 570, 583, 686 S.E.2d 176, 183 (2009) (holding an appellate court must conduct a de novo review of a trial court's determination of the constitutionality of a punitive damages award). This requires us to determine whether the award was reasonable in light of the following guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the amount of the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Austin v. Stokes–Craven Holding Corp.*, 387 S.C. 22, 52, 691 S.E.2d 135, 151 (2010) (citing *Mitchell*, 385 S.C. at 585, 587–88, 686 S.E.2d at 184–86; *BMW of N. Am. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). We affirm the

---

**5.** The jury found neither actual nor punitive damages against Power Engineering, refuting Stonington's argument that the charge required the jury to find actual and punitive damages "as to both Defendants."

award of punitive damages, but reduce the amount to $2 million.

### a. Reprehensibility

 Our discussion of the facts of this case demonstrates that Stonington's misconduct was reprehensible. In order to evaluate the reasonableness of the amount of the award, however, we must determine the degree of reprehensibility. *Austin,* 387 S.C. at 53, 691 S.E.2d at 151; *see also State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."); *Gore,* 517 U.S. at 575, 116 S.Ct. 1589 (describing reprehensible conduct sufficient for an award of punitive damages as reflecting " 'the enormity of [the] offense' " and "the accepted view that some wrongs are more blameworthy than others" (quoting *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371 (1852))). In doing so, we must consider whether

> (i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident.

*Mitchell,* 385 S.C. at 587, 686 S.E.2d at 185.

 Our analysis of the first two of these considerations indicates Stonington's misconduct involved a lesser degree of reprehensibility. First, although the Hollises and Robinsons incurred significant monetary damages, they did not suffer any physical harm. Finding only economic harm "would typically weigh against [ ] reprehensibility." 385 S.C. at 589, 686 S.E.2d at 186; *see also Duncan v. Ford Motor Co.,* 385 S.C. 119, 143, 682 S.E.2d 877, 889 (Ct.App.2009) (finding the existence of only economic harm weighs in favor of the defendant).

Second, while Stonington's conduct did demonstrate an indifference to the property rights of others, it did not evince an indifference to or reckless disregard for the health or safety of people. Reckless disregard for the property rights of others can be sufficient misconduct to support an award of punitive damages. *See Harris v. Burnside,* 261 S.C. 190, 196, 199 S.E.2d 65, 68 (1973) (explaining in a tort action for property damages that "punitive damages are allowable in tort actions, not only as a punishment for wrong, but as a vindication of private rights when it is proved that such have been wantonly, willfully or maliciously violated"). However, when evaluating the degree of a defendant's reprehensibility in a post-trial review of the award, the defendant's reprehensibility is not enhanced pursuant to this second consideration unless it involves the reckless disregard for the health or safety of people.

As to the third consideration, the record does not indicate, and neither of the parties argues, whether the Hollises and Robinsons were financially vulnerable. Thus, the third consideration does not favor a lesser or a higher degree of reprehensibility.

The fourth and fifth considerations, however, indicate a higher degree of reprehensibility. As to the fourth consideration, no evidence was presented as to whether Stonington or its members had engaged in similar conduct on other development projects. However, Stonington's conduct involved repeated actions towards the Hollises and Robinsons, and thus was not an isolated incident. In the face of repeated requests from the Hollises and Robinsons to fix the ongoing problems, and despite repeated official notices of regulatory violations, Stonington continued for over four years [6] to engage in conduct the jury determined to be reckless. *See Mitchell,* 385 S.C. at 589–90, 686 S.E.2d at 186 (finding the defendant's

---

**6.** We mention that the conduct lasted over four years in recognition of the supreme court's statement that it is no longer necessary to consider the duration of the conduct as a separate factor. *Mitchell,* 385 S.C. at 587 n. 7, 686 S.E.2d at 185 n. 7. In this case, however, the duration of the conduct helps us to understand whether the conduct was an isolated incident or involved repeated actions. *See* 385 S.C. at 589, 686 S.E.2d at 186 (noting in considering this fourth factor that "Fortis's conduct involved repeated acts of deliberate indifference for more than two years").

"conduct involved repeated acts of deliberate indifference" without considering its conduct on other policies or claims). Finally, as to the fifth consideration, the Hollises and Robinsons' harm was to some extent the result of intentional deceit, rather than mere accident. Stonington made repeated promises to the Hollises and Robinsons that it would fix the problems caused by its development, but failed to take any meaningful steps to fulfill those promises. As a particular example of its deceitful conduct, Stonington told them it would provide a conservation easement so that they would have a fifty-foot buffer of trees to protect their property from runoff. Stonington then clearcut the trees, leaving itself with a tax deduction of $1 million and the Hollises and Robinsons with no protection from stormwater runoff.

Considering the entire record in this case in light of the five factors discussed above, we find that Stonington's misconduct was moderately reprehensible.

### b. Disparity Between Actual or Potential Harm and the Punitive Damages Award

The ratio of punitive damages awarded by the jury in this case to actual damages is 8.75 to 1.[7] We find this to be an excessive disparity between the punitive damages awarded and the harm actually suffered by the Hollises and Robinsons.[8] In making this determination, and in setting the amount to which punitive damages must be reduced, we have considered "the likelihood that the award will deter the defendant from like conduct; whether the award is reasonably related to the harm likely to result from such conduct; and the defendant's ability to pay." *Mitchell,* 385 S.C. at 588, 686 S.E.2d at 185.

We note initially that the parties have given us little information to use in evaluating the first and third considerations.

---

7. In calculating the ratios in this case, we have used actual damages of $400,000.00 rather than the actual damages judgment amount of $315,000.00.

8. This is not a case in which it is appropriate to consider potential harm over and above the actual harm suffered by the plaintiff. *See Mitchell,* 385 S.C. at 590, 686 S.E.2d at 187 ("[I]n certain cases [a court] may compare [the punitive damages award] to the *potential* harm suffered by the plaintiff.").

As to the first consideration, deterrence, the record does not clearly indicate whether Stonington is an ongoing entity in the development business or whether it was created solely for this one project. Therefore, it is difficult to analyze the deterrent effect the punitive damages award will have on Stonington. The record indicates that Stonington still owns large tracts of undeveloped land in the subdivision and is developing the subdivision in phases. Thus, the jury's award will likely have a deterrent effect as to Stonington's future work on this development.

■■■ In upholding the award, the trial court relied on the deterrent effect this award may have on others in the development business. In its post-trial order the court stated: "The jury's punitive damages award will send a strong message to developers that such a way of doing business is not acceptable to the people of Richland County." We significantly discount the importance of this consideration in evaluating the constitutionality of the award. The deterrent effect the imposition of punitive damages may have on others cannot be used as a significant basis for upholding an award of punitive damages.

Deterrence has long been an important consideration in the imposition of punitive damages. In *Mitchell,* the supreme court began its discussion of the history of due process limitations on punitive damages awards by stating "[t]he practice of awarding punitive damages originated in principles of common law 'to deter the wrongdoer and others from committing like offenses in the future.'" 385 S.C. at 584, 686 S.E.2d at 183 (quoting *Laird v. Nationwide Ins. Co.,* 243 S.C. 388, 393, 134 S.E.2d 206, 210 (1964)). Summarizing its decision reducing the award of punitive damages in *Mitchell,* the supreme court stated: "We are also certain that a $10 million award will adequately vindicate the twin purposes of punishment and deterrence that support the imposition of punitive damages." 385 S.C. at 594, 686 S.E.2d at 188.

The concept of deterrence includes the specific effect on the party against whom the award is imposed and the general effect the award will have on others similarly situated. In *Gamble v. Stevenson,* the supreme court listed as one of the factors a trial court may consider in its post-trial review of punitive damages the "likelihood the award will deter the

defendant *or others* from like conduct." 305 S.C. 104, 112, 406 S.E.2d 350, 354 (1991) (emphasis added). In *Mitchell,* the supreme court stated, "*Gamble* remains relevant to the post-judgment due process analysis," 385 S.C. at 587, 686 S.E.2d at 185, and repeated the "or others" language in its discussion of *Gamble.* 385 S.C. at 586, 686 S.E.2d at 184. However, listing deterrence as a specific consideration in the analysis of the "ratio" guidepost under *Gore,* the *Mitchell* court omitted the "or others" language. 385 S.C. at 588, 686 S.E.2d at 185.

Because of the trial court's consideration of the deterrent effect on other developers to justify this punitive damages award, the omission of the "or others" language is significant in our review of the trial court's decision. The *Mitchell* court noted that "much of the [United States] Supreme Court's punitive damages jurisprudence has focused on the type of evidence that may be used to support a punitive damages award." 385 S.C. at 585–86, 686 S.E.2d at 184. In support of the point that "the Supreme Court has continued to ... delineate the contours of punitive damages awards that 'run wild,' " the court cited *Campbell,* 538 U.S. at 421–22, 123 S.Ct. 1513, for the proposition that "punitive damages awards may not be based on out-of-state conduct," and *Philip Morris USA v. Williams,* 549 U.S. 346, 354, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007), for the proposition that "a punitive damages award that is based on evidence of harm to persons other than the plaintiff ... will violate due process." *Mitchell,* 385 S.C. at 586, 686 S.E.2d at 184. Just as these decisions have limited the use of harm "to others" as a basis of a punitive damages award, we believe there are significant concerns associated with using a punitive damages award's deterrent effect "on others" to justify the amount of an award. Thus, although the deterrent effect on the specific defendant must be considered, the general deterrent effect on others who are not connected to the case is not a significant factor in analyzing the constitutionality of an award.

█ This case, however, presents a "deterrence" consideration somewhere in the middle. Stonington's only representative to testify at trial described the members of Stonington Development, LLC. In particular, the witness's testimony indicates that the managing member of Stonington is heavily involved in the development business, not only with Stoning-

ton, but with several other corporate entities doing development work in the area. In considering the deterrent effect the punitive damages award will have on Stonington, we find it appropriate to consider the fact that its managing member is independently involved in the development business, and the punitive damages award is highly likely to deter him from similar misconduct in the future.

The second consideration is "whether the award is reasonably related to the harm likely to result from such conduct." *Mitchell*, 385 S.C. at 588, 686 S.E.2d at 185. In making this comparison, we note that the award of actual damages was substantial. Both our supreme court and the United States Supreme Court have stated that when the actual damages awarded are substantial, " 'a lesser ratio, perhaps only equal to compensatory damages, can reach the outer limits of the due process guarantee.' " *Mitchell*, 385 S.C. at 592, 686 S.E.2d at 187 (quoting *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513). The fact that the actual damages award in this case is substantial helps us to evaluate whether the punitive damages award is reasonably related to the harm likely to result from similar conduct. We find the award of $3.5 million is not reasonably related to the likely harm.

We must also consider whether the amount to which we reduce the award is reasonably related to the likely harm. While a $2 million award results in a ratio of 5 to 1, considerably higher than the actual damages, such an award is reasonably related to the harm likely to result from ignoring stormwater management regulations on large residential development projects such as the subdivision created by Stonington.

As to the third consideration, other than evidence that Stonington still owns large portions of the original development, the record contains no direct evidence of Stonington's ability to pay a punitive damages award.

### c. Comparative Penalty Awards

██ The third guidepost is "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Austin*, 387 S.C. at 52, 691 S.E.2d at 151. There are two civil penalties that

could be applied to Stonington's misconduct. First, the South Carolina Department of Health and Environmental Control, other State agencies regulating stormwater, and even local governments may impose a civil penalty of $1,000.00 a day against any person violating the "Standards for Stormwater Management and Sediment Reduction" contained in Chapter 72 of the South Carolina Code of Regulations. 26 S.C.Code Ann. Regs. 72–315(A) (Supp.2010). The regulation provides the penalty may be imposed for any violation of a stormwater management or sediment control ordinance or regulation, and it specifically allows a separate penalty for each day the violation continues. *Id.* The record indicates that Stonington was required on June 4, 2001, to construct a detention pond and had not yet adequately constructed it by January 30, 2004. Stonington was first officially notified it was in violation of stormwater management or sediment control regulations on November 6, 2002, and it received numerous additional violation notices related to the detention pond and other aspects of its stormwater management responsibilities between then and March 15, 2006.[9] While the record does not allow a precise calculation of the total number of days Stonington remained in violation, we have determined it to be a minimum of 857 days. Viewing the evidence in the light most favorable to the Hollises and Robinsons, however, Stonington had not cured the violations as of the jury's verdict on April 6, 2007, which is 1,612 days from November 6, 2002. Thus, the maximum daily fine that could have been imposed on Stonington ranged from $857,000.00 to $1.612 million.

Under federal law, the Administrator of the Environmental Protection Agency may seek a civil penalty of up to $25,000.00 per day for misconduct similar to that engaged in by Stonington. 33 U.S.C. § 1319(d) (Supp.2010). Applicable federal regulations require that sediment and erosion controls must "[a]t a minimum ... be designed, installed, and maintained to: ... (2) Control stormwater discharges ... to minimize downstream channel and streambank erosion; ... (5) Minimize sediment discharges from the site....; (6) Provide and maintain natural buffers around surface waters...." 40 C.F.R.

9. Stonington received official violation notices on November 6, 2002, April 18, 2003, October 13, 2003, January 30, 2004, December 28, 2004, January 26, 2005, February 8, 2006, and March 15, 2006.

§ 450.21(a)(2), (5)–(6) (2010). Stonington's violations of these regulations could have resulted in a total penalty that far exceeds the punitive damages figures we are considering in this case.

### d. The Court's Role in Reducing the Amount of Punitive Damages

 Because we find the award of $3.5 million in punitive damages is excessive and violates due process, we must reduce the award.[10] In reducing the amount of the punitive damages, we are not permitted to make the determination independent of the jury of what we think the appropriate amount of punitive damages should be in this case. Rather, in deference to the jury, we may do no more than determine the upper limit of the range of punitive damages awards consistent with due process on the facts of this case, and set the amount of punitive damages accordingly. *See Mitchell,* 385 S.C. at 590–94, 686 S.E.2d at 187–88 (reducing punitive damages award to the upper limit of due process).[11]

 Additionally, *Mitchell*'s holding that appellate courts must conduct the review of punitive damages awards de

---

**10.** We have the option of ordering a new trial. *See EEOC v. Fed. Express Corp.,* 513 F.3d 360, 376 (4th Cir.2008) ("If a punitive damages award is unconstitutionally excessive, it is our obligation to order a remittitur or award a new trial."). However, after finding the award to be excessive, South Carolina appellate courts have uniformly reduced the punitive damages award over the option of ordering a new trial. *But see Atkinson v. Orkin Exterminating Co.,* 361 S.C. 156, 166, 604 S.E.2d 385, 390 (2004) (reversing and remanding punitive damages because the trial court improperly admitted prejudicial evidence). In *Mitchell,* the supreme court implicitly rejected the option of a new trial. After finding the award "exceeds due process limits," the court stated: "There is ample evidence in the record to support the imposition of punitive damages, and there is no need for further findings of fact." 385 S.C. at 592, 686 S.E.2d at 187. We have noted some considerations as to which the record gives us little or no information. Nevertheless, as the supreme court did in *Mitchell,* we find the record here is adequate for us to conduct our review of the award, and we find no reason to remand for a new trial.

**11.** *See also CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.,* 499 F.3d 184, 193 (3d Cir.2007) (according deference to the jury's award in decreasing punitive damages only to constitutional upper limit); *Bach v. First Union Nat'l Bank,* 486 F.3d 150, 156–57 (6th Cir.2007) (same).

novo is consistent with this deferential approach. We do not conduct a de novo review of the jury's determination of the proper amount to award as punitive damages. Rather, we use "a de novo standard for the review of trial court determinations of the constitutionality of punitive damages awards." *Mitchell,* 385 S.C. at 583, 686 S.E.2d at 182; *see also Austin,* 387 S.C. at 52, 691 S.E.2d at 151 ("[A]n appellate court reviews de novo the trial judge's application of these guideposts."). This entitles us only to review the determination of the constitutionality of the award. Both the plaintiffs and the defendant have a federal and state constitutional right to a trial by jury on the question of punitive damages. *See* U.S. Const. amend. VII; S.C. Const. art. I, § 14; *see also Defender Indus. Inc. v. Northwestern Mut. Life Ins. Co.,* 938 F.2d 502, 507 (4th Cir.1991) ("[W]e hold that the seventh amendment guarantees the right to a jury determination of the amount of punitive damages...."). We may not usurp the jury's function and set the amount we believe to be appropriate. If we find the jury's award unconstitutionally excessive, we may reduce it only to the upper limit of what would be acceptable under due process.

### e. Conclusion as to the Amount of Punitive Damages

Therefore, reviewing de novo the trial court's determination of constitutionality, but deferring to the jury's constitutional role as factfinder, we find the upper limit of the range of punitive damages awards consistent with due process on the facts of this case to be $2 million, and we reduce the award accordingly.

### VI. Failure to Grant Stonington's Motions for JNOV, New Trial Absolute, or New Trial Nisi Remittitur

Finally, Stonington appeals the denial of its motion for judgment notwithstanding the verdict or for a new trial based on the trial judge entering the jury room to answer a juror's question. We find this issue unpreserved for our review.

At one point during a witness's testimony, the judge interrupted and said to a juror, "You need a break?" to which the juror responded, "Is it possible for me to get a pen and a piece of paper? I have a question for you." The judge instructed

everyone to "Stop" and said to the jury, "Go to the jury room. If you have a question, as the Forelady and members of the jury, write it down for me. I'll take a look at it." After the break, the judge explained on the record:

I spoke to the jury in the room. The note that the Forelady wrote me was: Can jurors ask questions? And I think I was polite about it, the answer was, no, of course. And of course that's the job of the lawyers as I explained to y'all in the jury room.

Stonington's counsel neither objected nor asked for any clarification as to the conversation between the judge and the jurors.

 "[I]t is the responsibility of trial counsel to preserve issues for appellate review." *Jackson v. Speed*, 326 S.C. 289, 306, 486 S.E.2d 750, 759 (1997). "[A]n issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the circuit court to be preserved." *RRR, Inc. v. Toggas*, 378 S.C. 174, 185, 662 S.E.2d 438, 443 (Ct.App. 2008).

 We recognize that our supreme court has held a trial judge entering the jury room is reversible error. *State v. Elmore*, 279 S.C. 417, 421–22, 308 S.E.2d 781, 784–85 (1983) ("Although we find no actual prejudice in this instance, we hold this conduct to be reversible error regardless of the presence of counsel."). However, *Elmore* is not controlling in a civil case. The ruling in *Elmore* was based in part on the right of a criminal defendant to "be present at all stages of a trial." 279 S.C. at 422, 308 S.E.2d at 785. Further, *Elmore* was a death penalty case decided before the supreme court abrogated *in favorem vitae* in *State v. Torrence*, 305 S.C. 45, 60, 406 S.E.2d 315, 324 (1991) (Toal, J., concurring). We make no comment on the continued viability of this holding from *Elmore* in death penalty or other criminal cases. However, such an exception to the rules of issue preservation is not warranted on the facts of this civil case.

As to the remainder of Stonington's allegations that the trial court erred in refusing to grant its post-trial motions for JNOV, new trial absolute, or new trial nisi remittitur, we deem them abandoned and decline to address the merits. *See* Rule 208(b)(1)(D), SCACR (stating each "particular issue to be

addressed shall be set forth in distinctive type, followed by discussion and citations of authority"); *Bennett v. Investors Title Ins. Co.*, 370 S.C. 578, 599, 635 S.E.2d 649, 660 (Ct.App. 2006) (finding appellants abandoned an issue on appeal where they failed to cite any case law for a proposition and made only conclusory arguments in support).

## VII. Conclusion

We affirm the denial of a directed verdict on punitive damages, the jury charge on punitive damages, and the denial of Stonington's post-trial motions. We also affirm the imposition of punitive damages, but because we find the amount excessive, in violation of due process, we reduce the award from $3.5 million to $2 million.

**AFFIRMED AS MODIFIED.**

THOMAS and KONDUROS, JJ., concur.