# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Sea Island Food Group, LLC, d/b/a Squeeze, Plaintiff,

v.

Yaschik Development Company, Inc., d/b/a Yaschik Enterprises, Hilton Smith, East Bay Company, Ltd., Michael J. Quillen Family Limited Partnership, Defendants.


Michael J. Quillen Family Limited Partnership, Third-Party Plaintiff,

v.

Top of the Bay, LLC, Third-Party Defendant.


Top of the Bay, LLC, d/b/a Club Light, Fourth-Party Plaintiff, Respondent,

v.

Yaschik Development Company, Inc., d/b/a Yaschik Enterprises, Fourth-Party Defendant, Appellant.

Appellate Case No. 2018-000906

────────────

Appeal From Charleston County
Roger M. Young, Sr., Circuit Court Judge

────────────

Opinion No. 5794
Heard December 9, 2020 – Filed January 27, 2021
Withdrawn, Substituted and Refiled May 12, 2021

## AFFIRMED

E. Brandon Gaskins, of Moore & Van Allen, PLLC, and Robert Ernest Sumner, IV, of Butler Snow, LLP, both of Charleston; and Charles Robert Scarminach, of Atlanta GA, all for Appellant.

W. Tracy Brown, of The Brown Law Firm, of Summerville, and William Koatesworth Swope, of The Swope Law Firm, PA, of Charleston, for Respondent.

**HEWITT, J.:** This case arose out of a building owner's decision to terminate the building's master lease after a fire. It comes to us presenting two issues. The first is whether a subtenant has an intentional interference with contract claim against the owner if the owner's wrongful declaration that the building was "totally destroyed" interfered with the sublease. The second is a multi-pronged challenge to the jury's award of punitive damages.

We affirm. There was evidence upon which the jury could find the owner improperly declared the property "totally destroyed." That unjust declaration directly interfered with the building's subleases: necessarily constituting interference with contract. We also agree with the trial court's thorough review of the jury's punitive damages award.

## FACTS

The building in question is located at 213 East Bay Street in downtown Charleston. Yashick Development Co. purchased the property in 2003 for approximately $1.8 million. It leased the building to a limited partnership (the Master Tenant). The Master Tenant rented space to subtenants.

A fire started on the building's second floor one night in April 2013. The fire caused extensive damage to the second floor and roof. There was less damage to the building's other areas. In the following months, the Master Tenant hired a company

to secure the building and begin the clean-up process. It also hired a company to perform architectural and engineering services for the building's repair.

Within months, the stakeholders became aware of issues related to restoring the building and complying with the applicable earthquake building code. The Master Tenant notified Yaschik of these challenges in June 2013. The Master Tenant also said it believed the total cost of reconstruction would "certainly" exceed the insurance; possibly by "a significant amount." The Master Tenant had a $1 million insurance policy for the property. Yaschik paid substantially more than $1 million when it purchased the building. Still, the master lease only required the Master Tenant to carry $1 million in insurance.

In August 2013, the Master Tenant notified Yaschik again that reconstruction would require significant additional finances because the repair work would exceed the insurance proceeds. The Master Tenant estimated it could cost between $1.5 and $1.8 million in addition to the $500,000 already spent out of the $1 million insurance. Email messages from around the same time show that Yaschik and the Master Tenant disputed who had final responsibility to pay for the repair/rebuild.

Things came to a head the next month; five months after the fire. The Master Tenant sent Yaschik a letter advising of several developments, including the insurance company's decision to pay the remaining insurance. The Master Tenant insisted Yaschik approve the structural plans for the building's repair before submitting them to the City of Charleston. About a week later, Yaschik sent the Master Tenant a letter purporting to terminate the master lease, claiming the building was a total loss.

The relevant part of the lease provides:

> If premises are totally destroyed by fire or other casualty, this lease shall terminate as of the date of such destruction and rental shall be accounted for as between Landlord and Tenant as of that date. If premises are damaged but not wholly destroyed by fire or other casualty, rent shall abate in such proportion as use of premises has been lost to the Tenant. Landlord shall restore premises to substantially the same condition as prior to damage as speedily as practicable, whereupon full rental shall commence.

The subleases contained language similar to the master lease regarding the building's destruction due to fire. The Master Tenant and the subtenants took the position that

the building was not "totally destroyed" and that Yaschik's termination was ineffective.

At some point, the Master Tenant and subtenants discovered Yaschik had been negotiating since at least May 2013 to sell the building to a neighboring property owner. May 2013 was a month after the fire, and roughly four months before Yaschik declared the building totally destroyed.

Three months *after* Yaschik declared the building destroyed, Yaschik and the neighbor reached a contingent agreement for the property's sale. That transaction never closed. Yaschik instead undertook efforts to restore the property on its own.

The resulting lawsuit involved multiple parties and claims. Many of the claims, if not all of them, stemmed from Yaschik terminating the master lease and subleases.

The claim at issue in this appeal is the claim against Yaschik by a subtenant—Top of the Bay, Inc. d/b/a Club Light (Top). Top claimed Yaschik wrongfully terminated the master lease, interfering with Top's sublease with the Master Tenant. Top also sued the Master Tenant, claiming the Master Tenant breached the sublease by not restoring the fire-damaged premises.

Much of Yaschik's argument on appeal is tied to the fact that the trial court granted the Master Tenant a directed verdict on Top's breach of contract claim, finding the Master Tenant's duty to restore the building, if any, expired once Yaschik terminated the master lease. The trial court denied Yaschik's similar motion on Top's intentional interference claim, finding the issue of whether Yaschik was justified in declaring the premises a total loss was a jury question.

The jury found Yaschik breached the master lease and interfered with the subleases by improperly declaring the building a total loss. It entered substantial verdicts against Yaschik and in favor of the Master Tenant and the subtenants. On the claim at issue here (intentional interference with Top's sublease), the jury awarded Top $1 in nominal damages and $133,333.33 in punitive damages. Yaschik moved for judgment notwithstanding the verdict (JNOV), a new trial, a new trial nisi remittitur, or setoff. The trial court denied these motions in a detailed written order. This appeal followed.

**ISSUES**

The first issue is whether the trial court erred in failing to grant Yaschik a directed verdict or JNOV on Top's claim for intentional interference with Top's sublease. The second issue is whether the jury's punitive damages award was improper and contrary to law. Yaschik presented the issues somewhat differently in its brief. We have consolidated some of them for the purposes of this opinion.

## DIRECTED VERDICT/JNOV

"In ruling on motions for directed verdict or [JNOV], the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *Steinke v. South Carolina Dep't of Labor, Licensing & Reg.*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999). "The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt." *Id.* "[T]he trial [court] cannot disturb the factual findings of a jury unless a review of the record discloses no evidence which reasonably supports them." *Burns v. Universal Health Servs., Inc.*, 361 S.C. 221, 231–32, 603 S.E.2d 605, 611 (Ct. App. 2004). "The appellate court will reverse the trial court's ruling on a JNOV motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Id.* at 232, 603 S.E.2d at 611.

"The elements of a cause of action for tortious interference with contract are: (1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." *Camp v. Springs Mortg. Corp.*, 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993). "An essential element to the cause of action for tortious interference with contractual relations requires the intentional procurement of the contract's breach. Where there is no breach of the contract, there can be no recovery." *Eldeco, Inc. v. Charleston Cty. Sch. Dist.*, 372 S.C. 470, 481, 642 S.E.2d 726, 732 (2007) (citation omitted).

The Fourth Circuit has noted that "[w]hat constitutes improper means [of interference] may be somewhat difficult to distill as a rule of law . . . ." *Waldrep Bros. Beauty Supply v. Wynn Beauty Supply Co.*, 992 F.2d 59, 63 (4th Cir. 1993). "Interference with a contract is justified when it is motivated by legitimate business purposes." *Gailliard v. Fleet Mortg. Corp.*, 880 F. Supp. 1085, 1089 (D.S.C. 1995). "Generally, there can be no finding of intentional interference with . . . contractual relations if there is no evidence to suggest any purpose or motive by the defendant other than the proper pursuit of its own contractual rights with a third party." *Eldeco*, at 482, 642 S.E.2d at 732 (quoting *Southern Contracting, Inc. v. H.C. Brown Constr.*

*Co.*, 317 S.C. 95, 102, 450 S.E.2d 602, 606 (Ct. App. 1994)). Examples of improper methods include slander, sabotage, violence, fraud, and misrepresentation or deceit. *See Waldrep Bros. Beauty Supply*, 992 F.2d at 63–64.

Yaschik's lead argument relies on a misinterpretation of the trial court's ruling. The trial court explained that it did not find the subtenants failed to demonstrate the Master Tenant breached the subleases; the court found the Master Tenant had a valid defense for any breach of the subleases. Specifically, the trial court found the Master Tenant was relieved of its duties under the subleases once Yaschik declared the building a total loss and terminated the master lease. We agree with the trial court's finding. The "breach" part of Top's interference claim did not require the trial court to find that the Master Tenant was responsible for repairing the building and that the Master Tenant breached that promise. The "breach" element could stand as long as there was evidence Yaschik's declaration of a total loss kept the Master Tenant from honoring the sublease.

Yaschik also argues any interference with Top's sublease was justified. Specifically, Yaschik contends it made a reasonable business decision in deciding to sell the property instead of restoring it at significant cost.

There was certainly evidence from which the jury could conclude Yaschik's decision to declare the building "totally destroyed" was justified in light of the large amount of money it would take in excess of the insurance coverage to restore the building. But there was also evidence that Yaschik did not believe the building was "totally destroyed" and terminated the master lease (as well as the subleases) out of a desire to protect and advance its own interests rather than honor its obligations under the master lease. Yaschik's interest was adverse to the Master Tenant and subtenants in this respect: Yaschik was interested in saving money; the Master Tenant and subtenants were interested in a quick repair allowing their businesses to reopen.

There is evidence in the record that Yaschik believed the building was more marketable if it was not encumbered by the Master Lease and subleases. Thus, on top of the evidence Yaschik did not believe the building was totally destroyed, there was evidence from which the jury could find Yaschik terminated the master lease and subleases to enhance its position at the tenants' detriment and assist its secret negotiations. At bottom, we simply disagree with Yaschik's argument that breaching a contract (and interfering with other agreements) because the contract looks less profitable than desired precludes an intentional interference claim. *Cf.* Restatement (Second) of Torts § 767 (1979) (listing several factors that assist in evaluating whether interference is "improper").

We could not find a South Carolina case directly on point, but Top's intentional interference claim is generally consistent with precedent. Our supreme court previously upheld an intentional interference claim based on the potential that a jury could determine a third party intended to procure a breach of someone else's employment agreement. *See Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 287 S.C. 190, 191, 336 S.E.2d 472, 472 (1985). This court also previously distinguished intentional interference claims by noting that breaches occurring because of a third party's exercise of its undisputed contractual rights are not actionable, but breaches caused by mere business interest can be. *See S. Contracting, Inc. v. H.C. Brown Const. Co.*, 317 S.C. 95, 101, 450 S.E.2d 602, 605 (Ct. App. 1994) (distinguishing *American Sur. Co. v. Schottenbauer*, 257 F.2d 6 (8th Cir. 1958)).

Yaschik conceded at oral argument that whether the building was "totally destroyed" was appropriately a jury question. The judge charged the jury on what it meant for a building to be "totally destroyed" and that the cost of repairs is only one way to measure a building's value. Because evidence supported conflicting inferences about Yaschik's purpose in declaring the building totally destroyed, we find the trial court properly denied Yaschik's motions for directed verdict and JNOV.

## PUNITIVE DAMAGES

Yaschik contends Top failed to present clear and convincing evidence that Yaschik's conduct was willful, wanton, or in reckless disregard of Top's rights. It also argues the punitive damages award violates due process because its conduct was not reprehensible and because of the disparity between the actual or potential harm and the award's amount.

"In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence." S.C. Code Ann. § 15-33-135 (2005). The jury has considerable discretion to determine the amount of damages. *See Hollis v. Stonington Dev., LLC*, 394 S.C. 383, 404-05, 714 S.E.2d 904, 915 (Ct. App. 2011) (noting the deference due to the jury on punitive damages). If there is a claim that an award of punitive damages violates due process, an appellate court examines the trial court's constitutional review de novo. *See Mitchell v. Fortis Ins. Co.*, 385 S.C. 570, 583, 686 S.E.2d 176, 183 (2009).

The trial court did not err in determining the jury's punitive damages award was supported by clear and convincing evidence. "In order to recover punitive damages, the plaintiff must present clear and convincing evidence that the defendant's conduct

was willful, wanton, or in reckless disregard of the plaintiff's rights." *Cody P. v. Bank of Am., N.A.*, 395 S.C. 611, 625, 720 S.E.2d 473, 480 (Ct. App. 2011). "The test by which a tort is to be characterized as reckless, [willful] or wanton is whether it has been committed in such a manner or under such circumstances that a person of ordinary reason or prudence would then have been conscious of it as an invasion of the plaintiff's rights." *Id.* (quoting *Rogers v. Florence Printing Co.*, 233 S.C. 567, 577–78, 106 S.E.2d 258, 263 (1958)).

Top presented evidence that Yaschik was aware Top was a subtenant under the master lease, yet still conducted private negotiations to sell the property and declared the building "destroyed" when it knew the building was not destroyed, thereby (and deliberately) terminating Top's sublease. This is sufficient for a jury to infer Yaschik acted with willful, wanton, or reckless disregard for Top's rights under the sublease.

The due process review of punitive damages involves the following factors:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the amount of the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Hollis*, 394 S.C. at 396, 714 S.E.2d at 911 (quoting *Austin v. Stokes–Craven Holding Corp.*, 387 S.C. 22, 52, 691 S.E.2d 135, 151 (2010)).

The degree of reprehensibility is determined by weighing the following factors:

> (i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident.

*Hollis*, 394 S.C. at 397, 714 S.E.2d at 911 (quoting *Mitchell*, 385 S.C. at 587, 686 S.E.2d at 185).

We agree with the trial court that the first two reprehensibility factors favor Yaschik: the harm in this case was purely economic and did not involve any indifference or reckless disregard for the health or safety of others. We also agree with the trial court that the third and fifth factors cut the other way. Top's owners were directly and materially impacted by the termination of Top's sublease, Yaschik's actions in terminating the master lease were no mere accident, and the jury could find Yaschik acted deceitfully based on the evidence presented.

As for whether there were repeated wrongful actions versus an isolated incident, even though Yaschik only terminated the master lease one time, the case centered on a series of actions playing out over several months from which the jury could have found multiple instances of deceit. Viewing all five reprehensibility factors, we agree with the trial court that they favor an award of punitive damages.

When looking at the disparity between actual or potential harm and a punitive damages award, a court may consider "the likelihood that the award will deter the defendant from like conduct; whether the award is reasonably related to the harm likely to result from such conduct; and the defendant's ability to pay." *Hollis*, 394 S.C. at 399, 714 S.E.2d at 913 (quoting *Mitchell*, 385 S.C. at 588, 686 S.E.2d at 185). Yaschik concedes it has the ability to pay these punitive damages. Further, we agree with the trial court that the award is directly related to the harm caused by Yaschik's conduct and that it is reasonable to believe the six figure award will deter Yaschik from engaging in similar conduct in the future.

Yaschik argues the ratio of punitive to other damages in these case is grossly disproportional and excessive. The jury awarded Top $1 in nominal damages and $133,333 in punitive damages, representing a 133,333:1 ratio. At face value, this ratio would be concerning. *See Duncan v. Ford Motor Co.*, 385 S.C. 119, 145, 682 S.E.2d 877, 890 (Ct. App. 2009) ("[I]n practice few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process." (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003))).

However, numerous federal cases have found that a "ratio test" is inapplicable in cases that involve nominal damages. *See Saunders v. Branch Banking And Tr. Co. of VA*, 526 F.3d 142, 154 (4th Cir. 2008) ("[W]hen a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" (quoting *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364–65 (11th Cir. 2004))); *Williams v. Kaufman Cty.*, 352 F.3d 994, 1016 (5th Cir.

2003) (stating "any punitive damages-to-*compensatory* damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded"); *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 645 (6th Cir. 2005) (noting that in a § 1983 unlawful arrest case, "the plaintiff's economic injury was so minimal as to be essentially nominal" and that in such a case, U.S. Supreme Court precedent "on the ratio component of the excessiveness inquiry—which involved substantial compensatory damages awards for economic and measurable noneconomic harm—are therefore of limited relevance." (footnote omitted)). We agree with this persuasive authority and find a ratio test is inapplicable in this case.

As to the third and final factor of the *Hollis* test, the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases, the parties agree there are no authorized civil penalties applicable in this case. Yaschik points to multiple South Carolina cases in which awards for punitive damages were upheld for tortious interference with contractual relations claims. *See Collins Entm't Corp. v. Coats & Coats Rental Amusement*, 355 S.C. 125, 139, 584 S.E.2d 120, 128 (Ct. App. 2003) (finding a 9.9 to 1 ratio was proper); *Collins Music Co. v. Terry*, 303 S.C. 358, 360, 400 S.E.2d 783, 784 (Ct. App. 1991) (finding a 6 to 1 ratio was proper); *Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 287 S.C. 190, 193, 336 S.E.2d 472, 474 (1985) (reinstating a punitive damage award with a ratio of 1.5 to 1). However, in all of these cases, the juries awarded meaningful compensatory damages as opposed to the nominal damages awarded here.

We agree with the trial court that it makes sense to look to the damages awarded to the other subtenant that was similarly situated. That subtenant—Sea Island Food Group, LLC d/b/a Squeeze (Squeeze)—was awarded roughly $740,000 in actual damages and nearly $470,000 in punitive damages. Given that Squeeze was in essentially the same position and suffered the same harm as Top, we find the award of $133,333 in punitive damages was reasonable under the circumstances.

We note this analysis is highly fact dependent and that comparing the punitive damage awards to other parties may not be appropriate in other cases. However, given the facts of this case, we find this comparison appropriate.

We agree with the trial court that the nominal damage award was likely based on the fact that Top did not present enough information for the jury to decide the amount of Top's lost profits without speculating. That does not diminish the jury's additional findings that Yaschik violated Top's rights, and did so willfully.

Given all these factors, we find the jury's punitive damages award did not violate Yaschik's due process rights.

**CONCLUSION**

Based on the foregoing, the trial court's denial of Top's motions for directed verdict, JNOV, and motions related to the punitive damages award are

**AFFIRMED.**

**THOMAS and HILL, JJ., concur.**